[Civ. No. 3032.    Second Appellate District, Division Two.—January 5, 1920.]

## LOLA MAY, Respondent, v. NEW YORK MOTION PICTURE CORPORATION (a Corporation), Appellant.

[1] MASTER AND SERVANT — DUTY OF SERVANT TO OBEY ORDERS — PROMISE IMPLIED BY LAW.—Where the relation of master and servant exists, the servant is bound to obey all reasonable orders of the master, not inconsistent with the contract of employment. A promise by the servant to obey the lawful and reasonable orders of his master within the scope of his employment is implied by law.

[2] ID.—DISOBEDIENCE OF REASONABLE ORDER—JUSTIFICATION FOR RESCISSION OF CONTRACT AND DISCHARGE—MOTIVE AND INJURY IMMATERIAL FACTORS.—Disobedience by the servant of a reasonable order of the master is a violation of duty which justifies a rescission by the master of the contract of employment and peremptory discharge of the servant, irrespective of the motive of the master in giving such order or whether actual injury resulted to his business.

---

2. Breach of duty by servant as good cause for his discharge, notes, Ann. Cas. 1916A, 1024, 1027; 5 L. R. A. (N. S.) 1176.

[3] ID.—WILLFUL DISOBEDIENCE — WHAT CONSTITUTES.—A "willful" disobedience by a servant of his master's order is an intentional disobedience, that is, the thing done or omitted to be done was done or omitted intentionally, but it does not necessarily imply any evil intent on the part of the servant or malice toward his master.

[4] ID.—REASONABLENESS OF ORDER—WHEN QUESTION FOR COURT OR FOR JURY.—Where the reasonableness of the master's order depends upon undisputed facts, and the inferences from the facts found or admitted all point one way, the question as to the reasonableness of the order or rule is one of law for the court and not a question for the jury; but where the reasonableness of the order does not rest wholly upon undisputed facts, or its reasonableness is not so apparent that but one inference can reasonably be deduced from the proved or admitted facts, it is for the jury to determine whether the order is reasonable or not.

[5] ID.—EMPLOYMENT AS ACTRESS—ORDER · FIXING TIME FOR APPEARANCE AT STUDIO—CONSISTENCY WITH CONTRACT.—An order requiring plaintiff to report at defendant's studio every morning at 8:30 o'clock, where she might be readily notified when and where she would be required to act in some play in which she had been or was about to be cast, was not outside the circle of duties incident to her employment, or inconsistent with the provisions of her contract of employment which, in effect, required her to give defendant all her services as a motion picture actress during the period covered by the contract, "to act in such parts and at such times and places" as she might be instructed, and "to report for rehearsals promptly after notification so to do."

[6] ID.—REASONABLENESS OF ORDER — CIRCUMSTANCES LEADING TO MAKING.—Nor was such order requiring plaintiff to report at defendant's studio every morning at 8:30 o'clock, by which time the other members of defendant's organization were, as a general rule, on the ground, unreasonable where the available means for travel between the studio and her abode, which was at a distance from the studio, was none too good, and she frequently arrived on the ground late for rehearsals and for motion picture productions, and at times when her presence was urgently needed in order that she might enact the roles in which she had been cast, defendant's servants had great difficulty in reaching her by telephone in order to notify her that her presence was desired.

[7] ID.—DISCHARGE FOR VIOLATION OF ORDER—PROPER INSTRUCTION TO JURY.—Plaintiff having been discharged because of a violation of such order, in an action to recover for an alleged wrongful discharge, the jury should have been instructed specifically that if it be true, as testified by defendant's witnesses, that plaintiff was frequently tardy, and that defendant, at times, had difficulty in

reaching her by telephone in order to notify her to be present to enact her roles, then the order requiring her to report at defendant's studio every morning at 8:30 o'clock was reasonable, and a willful disobedience of its terms would be good ground for her discharge; it being error to charge the jury that it was for them to determine whether the order was "within the terms of the contract" and whether it "was a reasonable order under the circumstances."

[8] ID.—EMPLOYMENT AT WEEKLY SALARY — ADDITIONAL COMPENSATION FOR OPTION FOR EXTENSION — WRONGFUL DISCHARGE — MEASURE OF DAMAGES.—Where the original contract between plaintiff and defendant, which provided for a specified weekly salary during the period of employment, was modified and provided that for the consideration of a given sum, to be paid in weekly installments, the defendant was granted an option to continue the contract for a further period at a specified weekly salary, in an action to recover for her wrongful discharge, the plaintiff is entitled to recover the aggregate of the two amounts agreed to be paid weekly during the first period of employment, less such sum as she might have earned by exercising reasonable diligence to secure other employment of the same or a substantially similar character, and not merely the amount of the weekly salary agreed to be paid.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles Monroe, Judge. Reversed.

The facts are stated in the opinion of the court.

Arthur Wright for Appellant.

Peyton H. Moore for Respondent.

FINLAYSON, P. J.—This is an action by a motion picture actress, employed by defendant, to recover for an alleged wrongful discharge, alleged to have occurred about twenty-one weeks before the expiration of the term of her employment. From a judgment for plaintiff for $2,123.60, based on the verdict of a jury, defendant appeals.

8. Measure of damages for wrongful discharge of servant, note, 6 L. R. A. (N. S.) 82.

Right of wrongfully discharged servant to recover wages for contract period subsequent to discharge, notes, 5 L. R. A. (N. S.) 439; 28 L. R. A. (N. S.) 577; for services actually rendered, note, 5 L. R. A. (N. S.) 582, 585.

The only controversy between the parties is whether the discharge was wrongful, and, if not, whether the damages awarded plaintiff were excessive. In the main, the questions presented by this appeal are concerned with certain instructions to the jury.

Plaintiff and defendant entered into a written contract, which, so far as material to our purpose, is as follows: "The party of the first part [defendant] hereby engages the party of the second part [plaintiff] as motion picture actress to enact roles in the motion picture productions of the party of the first part in its company and such companys as the party of the first part may hereafter form, for a period of one year, commencing June 16, 1915, and ending June 16, 1916, for a salary of $75.00 weekly. . . . The party of the second part agrees to abide by the rules and regulations of the producing company to which she may be assigned, and to report for rehearsals promptly after notification to do so, and to direct or act in such parts and at such places as she may be instructed." The contract, as modified by a subsequent written agreement, likewise provides that the "party of the second part [plaintiff] further, for the consideration of $1300.00, which is to be paid in weekly installments of $25.00 by the party of the first part, does hereby grant an option to the party of the first part [defendant] to continue this contract for the following year at a salary of $125.00 weekly, commencing June 16, 1916, and ending June 16, 1917."

Plaintiff commenced work for defendant on June 16, 1915, at defendant's camp or studio at Inceville, in Los Angeles County, about three and a half miles from the city of Santa Monica, and continued in its employ until discharged on January 27, 1916. During all this time plaintiff made her home at Santa Monica. The last day she worked for defendant was December 24, 1915. On that day defendant finished a picture in which plaintiff had been cast, and in which she had worked for some weeks. Except when specifically notified and sent for, plaintiff never went to the camp or studio, except weekly to draw her weekly pay check. Witnesses for defendant testified that prior to December 24, 1915, and during the time when plaintiff was acting parts in which she had been cast, she frequently arrived on the ground so late that her tardiness caused ex-

asperating delays that threw the whole working organization out of joint, causing defendant considerable financial loss. Other actors and actresses, and persons employed in connection with rehearsals and work before the camera, arrived on the ground, as a rule, not later than 8:30 o'clock in the morning; while, according to defendant's witnesses, plaintiff frequently was as late as 10 and 11 o'clock in arriving on the scene of her duties. When not actually working for defendant, plaintiff did not remain in her home at Santa Monica all day long, so that she might readily be communicated with by telephone or other convenient means of communication, in the event that she might be needed at the studio to enact some role. Upon a number of occasions, according to defendant's witnesses, when plaintiff's presence at the camp or studio was urgently needed in order that she might take part in a scene in which she had been cast, she could not be reached by telephone, although defendant's employees called up her Santa Monica residence in vain attempts to communicate with her. Defendant's manager testified that in December "there was a scene which required Miss May's presence in order to re-photograph it, and it was spoiled, and Mr. Swickert, the director, was unable to proceed for a period of at least two days endeavoring to get Miss May out to the grounds." Defendant's superintendent of production testified that on very many occasions plaintiff was late in arriving at the studio, and that on one occasion she failed to appear after she had been notified over the telephone. Clearly, the absence of one actor or actress necessarily deranges the work of the entire organization. The effect of the absence of even one actor or actress is graphically described by defendant's superintendent as follows: "One actor is a wheel. It is a wheel within wheels. And if one of the wheels is missing, we cannot go on with the machine; that is all." Needless to say, the testimony of defendant's witnesses respecting plaintiff's tardiness did not go entirely uncontradicted. Plaintiff testified that she reported promptly for all rehearsals *when notified so to do.* Our sole purpose in calling attention to defendant's evidence respecting plaintiff's tardiness and the difficulties experienced in communicating with her by telephone is to show that, if the situation was as described by defendant, the order given to plaintiff on January 22, 1916,

and presently to be referred to, was a reasonable order, made necessary by the conduct of plaintiff herself.

On January 7, 1916, defendant's manager sent for plaintiff and told her the company was cutting down expenses, that defendant might not be able to continue giving her leading parts, that she might have to take second parts, and suggested to her that she might think it to her advantage to take her two weeks' salary and return to New York. The next day plaintiff wrote defendant's manager that she fully realized that the written contract required her to act in such parts as might be assigned her, and that she expected to comply with her agreement in all particulars.

On January 22, 1916, defendant caused to be delivered to plaintiff a letter—written and signed on the 13th—which is as follows:

"Miss Lola May:

"In the future it will be absolutely necessary that you report at the studio every morning not later than 8:30 A. M., *irrespective of whether you are cast or not,* and not absenting yourself when you think you are not cast, as you have taken upon yourself to do in the past.

"Yours very truly,

"E. H. ALLEN, Manager."

This order we shall designate as the order of January 22, 1916,—the date of its delivery—though it was written and signed on the 13th. Whether this order is consistent with the written contract of employment, and whether it is a reasonable order, are the principal questions presented on this appeal.

It was stipulated at the trial that defendant had no printed general rules or regulations. Nor is there any evidence to show that defendant had any kind of general rules or regulations applying to actresses in its employ, enacting roles or parts in the producing company such as plaintiff was employed to enact, and requiring such actresses to report at defendant's studio every morning irrespective of whether they were cast in a part or not. Indeed, defendant does not claim ever to have promulgated any such general rule or regulation. On January 24, 1916, plaintiff wrote defendant a letter acknowledging receipt of defendant's order of January 22, 1916. In this letter to defendant

45 Cal. App.—26

plaintiff said: "I stand ready to comply with all reasonable requirements, as prescribed by your rules and regulations, applicable to persons employed to perform the same class of work for which I am engaged."

Plaintiff did not report at defendant's studio on the twenty-fourth, twenty-fifth, or twenty-sixth days of January, 1916. She was discharged on January 27th. On January 24th she had been cast in a play called "Beatrice of St. Cecile," but had not been notified thereof before her discharge on January 27th; although, according to defendant's director, he would have liked to see her as early as January 18th or 20th, in order to go over her part with her, but, according to the manager's assistant, she could not be reached on the telephone at that time.

On cross-examination plaintiff testified that she did not make any attempt to go to defendant's studio after receiving the order of January 22, 1916, for the reason that, as she claims, her contract did not require her to report at the studio if she was not cast for a part. On January 27, 1916, defendant discharged plaintiff by delivering to her a letter which reads:

"Dear Miss May:

"This is to notify you that you have automatically discharged yourself by refusing to report to work for the past three days. You can obtain the salary due you by applying to our cashier.

"Yours truly,
"NEW YORK MOTION PICTURE CORP.,
"By E. H. ALLEN."

The court instructed the jury that it was for them "to consider whether the order for her to appear at 8:30 A. M. after the 22d, when she received that notice, *was within the terms of the contract,* and was a reasonable order under the circumstances." This instruction was, we think, erroneous and clearly prejudicial.

[1] The relation of master and servant which, in contemplation of law, existed between these parties, cast certain duties upon plaintiff, as the servant, which she was bound to fulfill and discharge; the principal one was that of obedience to all reasonable orders of the defendant, the master, not inconsistent with the contract. "A promise

by the servant to obey the lawful and reasonable orders of
his master within the scope of his contract is implied by
law." (*Lacey* v. *Getman,* 119 N. Y. 115, [16 Am. St. Rep.
806, 6 L. R. A. 728, ·23 N. E. 452].) The following
passage from Fraser on Master and Servant is worth quot-
ing: "Of course the master cannot compel him to obey
further than has been agreed between them, or than is con-
sistent with law; but at the same time the servant is not
entitled to enter upon a minute measurement of the exact
limits of his service, or to weight in too nice a balance the
precise kind and quantity of labor which he can in strict
law be compelled to perform. While the servant will be
protected from harsh treatment, on the one hand, it is,
on the other, incumbent upon him to render a cheerful and
ready obedience in all points which, in the judgment *boni
viri,* cannot be considered any departure from the con-
tract." (Page 71.)

[2] Disobedience of a reasonable order is a violation of
duty which justifies a rescission by the master of the con-
tract of employment and peremptory discharge of the ser-
vant. (*Jerome* v. *Queen City Cycle Co.,* 163 N. Y. 351,
[57 N. E. 485] ; *Peniston* v. *John Y. Huber Co.,* 196 Pa.
580, [46 Atl. 934] ; *Von Heyne* v. *Tompkins,* 89 Minn. 77,
[5 L. R. A. (N. S.) 524, 93 N. W. 901] ; *School Directors*
v. *Hudson,* 88 Ill. 563; *Standidge* v. *Lynde,* 120 Ill. App.
418; *Wiley* v. *California Hosiery Co.,* 3 Cal. Unrep. 814,
[32 Pac. 522] ; Civ. Code, secs. 1981, 2000.) The law is
thus summarized in Fraser on Master and Servant, page
71: "Where a servant deliberately violates his master's
orders, or refuses to obey them when given, he is clearly
guilty of the grossest breach of contract. His duty is to
obey the master in all things for which he became bound
expressly, or in which obedience is implied from the nature
of the service undertaken." Any "willful" disobedience
of an order that is reasonable and not inconsistent with the
contract of employment is sufficient to justify the servant's
discharge. (Civ. Code, sec. 2000.) "Willful" disobedience
of a specific, peremptory instruction of the master, if the
instruction be reasonable and consistent with the contract,
is a breach of duty—a breach of the contract of service;
and, like any other breach of the contract, of itself entitles
the master to renounce the contract of employment. Ac-

cording to the decided preponderance of authority, a single act of disobedience to a specific, reasonable order from the master to the servant is, as a matter of law, a violation of duty that justifies the master in discharging (Labatt's Master and Servant, 2d ed., sec. 291, p. 897); and whether actual injury has resulted to the master's business is wholly beside the mark. (*Jerome* v. *Queen City Cycle Co., supra; Milligan* v. *Sligh Furniture Co.,* 111 Mich. 632, [70 N. W. 133]; Labatt's Master and Servant, 2d ed., secs. 273 and 291, subd. c.) The motive of the master in giving the order is not important. Whether the order is reasonable is the important question. The master has the right to make a reasonable order though he knows it will be distasteful to the servant, and even though he gives the order with the expectation that the servant will leave his employ rather than obey. (*Development Co.* v. *King,* 161 Fed. 91, [24 L. R. A. (N. S.) 812, 88 C. C. A. 255].)

[3] A "willful" disobedience is an intentional disobedience. It does not necessarily imply any evil intent on the part of the servant or malice toward his master. In civil cases, the word "willful," as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent. (*Benkert* v. *Benkert,* 32 Cal. 470; *Towle* v. *Mathews,* 130 Cal. 577, [62 Pac. 1064]; 40 Cyc. 944.) There are cases which go to the extent of holding that to justify a discharge for disobedience of orders, the disobedience must be perverse, but these cases cannot be vindicated on principle. (*McCain* v. *Desnoyers,* 64 Mo. App. 66. See Civ. Code, sec. 2000.)

[4] Whether the reasonableness of any particular rule or order given by the master to the servant is a question of law for the court or of fact for the jury, is a matter upon which the authorities are not entirely harmonious. We think the correct doctrine, deducible from a consideration and analysis of many authorities, may be stated substantially as follows: Where the reasonableness of the master's order depends upon undisputed facts, and the in-

ferences from the facts found or admitted · all point one way, the question as to the reasonableness of the order or rule is one of law for the court and not a question of fact for the jury. Where, however, the reasonableness of the order does not rest wholly upon undisputed facts, or its reasonableness is not so apparent that but one inference can reasonably be deduced from the proved or admitted facts, it is for the jury to determine whether the order is reasonable or not. (*Development Co.* v. *King, supra;* note to *Thomas* v. *Houston etc. Co.,* Ann. Cas. 1913C, p. 187; note to *Carpenter Steel Co.* v. *Norcross,* Ann. Cas. 1916A, pp. 1040, et seq.) "Courts will not permit jurors to guess or speculate when, from the undisputed evidence, it is *apparent* that the order of the master was reasonable." (Italics ours.)   (*Jerome* v. *Queen City Cycle Co., supra.*)

The questions, then, are, first, is the order of January 22, 1916, consistent with the contract between the parties? And, second, if it is, is it, under the circumstances that were detailed by defendant's witnesses, clearly a reasonable order? If these two questions must be answered in the affirmative, then it follows that their submission to the jury, in the form in which they were submitted in the instruction complained of, was prejudicial error.

[5]   We see nothing in the contract with which the order can be said to be inconsistent. By her contract plaintiff engaged to "enact roles in the motion picture productions" of defendant. The order of January 22, 1916, did not require plaintiff to perform service of a kind other than or different from that called for by her contract of employment, namely, the enactment of roles in motion pictures produced by defendant. The sole purpose of the order was to insure plaintiff's presence at a certain place, near the spot where the pictures were being filmed, in order that she might readily and conveniently be notified of the times when she would be required to enact any role in which defendant might see fit to cast her. By her written contract plaintiff, in effect, engaged to give defendant all her services as a motion picture actress during the whole of the year from and after June 16, 1915. There can be no doubt that if she had not expressly contracted "to report for rehearsals promptly *after notification so to do,*" defendant would have had the right to require her presence at or near

the camp at all reasonable times, to the end that, without delaying defendant's organization, largely made up of high-salaried actors and actresses, she might readily be notified when and where she would be required to act in some play in which she already had been or was about to be cast. We do not think defendant was deprived of this right merely because, by her written contract, plaintiff had expressly agreed "to report for rehearsals promptly after notification." She did not contract to "enact roles in the motion picture productions" *only* when notified of rehearsals. She agreed both to "enact roles in the motion picture productions" *and* "to report for rehearsals promptly after notification." Requiring her to report at the studio every morning at 8:30 o'clock was not outside the circle of duties incident to her employment. Her time was not hers to do with as she pleased; it belonged to her employer. And conceding that, as she claims, her contract obligated her to enact roles in defendant's motion picture productions only after notification so to do, nevertheless, her employer, in order to be able to give her the necessary notice without enduring undue delay and consequent financial loss, was entitled either to have her live at some near-by place where, at all times, she could conveniently be notified when her presence before the camera would be required, or else to report daily at some suitable place, the Inceville studio, for instance, where such notice could be given her. If this were not so, then plaintiff, if she chose, might have her abode at Riverside, or even as far away as San Francisco, and claim that she was not obliged to appear at defendant's studio save when defendant might telegraph or telephone or otherwise communicate with her at such distant place of abode. This hypothetical situation, though an extreme one, is but the logical result of the position that respondent has assumed here. With or without her agreement to report for "rehearsals promptly when notified," plaintiff's engagement "to enact roles in the motion picture productions" of defendant obligated her to be on hand to perform those services whenever needed, and to do so at such times and places, within reason, as her employer might require of her. To that end, and without adding anything to the terms of the contract, her employer was entitled to demand that

she report daily at any reasonable place, in order that she might conveniently be notified, and, without harassing delays, her presence before the camera be secured if, on that day, it so happened that she was wanted in some part. It must be remembered that, under her contract of employment, plaintiff could be cast for any part. She could be assigned second parts, or even required to take part in mob scenes with the multitude or "bush-wa," as those who take part in such scenes are designated in the profession. She herself, in her letter of January 8, 1916, admitted that she could be required "to act in such parts and at such times and places" as she might be instructed. This being the case, it was entirely consistent with the contract of employment to require her to be present every morning at 8:30 o'clock, when the other actors and actresses arrived, in order that she might immediately be notified to take part even in a mob scene, if her employer saw fit so to use her. For these reasons, we think it clear that the order to report daily at defendant's studio, irrespective of whether she was cast in a part or not, was not inconsistent with plaintiff's written contract of employment.

[6] Nor was the order unreasonable if, as testified by defendant's witnesses, plaintiff frequently arrived on the ground late for rehearsals and for motion picture productions, and if defendant's servants, at times when her presence was urgently needed in order that she might enact the roles in which she had been cast, had great difficulty in reaching her by telephone, in order to notify her that her presence was required. By her own conduct, if defendant's witnesses have truthfully and accurately described the conditions created by plaintiff's habitual tardiness and the difficulties encountered in endeavoring to communicate with her upon occasions when her presence was needed, she herself has made the order a reasonable, if not a necessary one. Plaintiff's place of abode at Santa Monica was three and one-half miles from the canyon in which defendant had its camp or studio. The available means for travel between the two places, particularly during the rainy season, was none too good. Defendant's business was so conducted that it was necessary to commence work early in the morning, so as to take advantage of all possible sunlight. The other members of defendant's large organization were, as a gen-

eral rule, on the ground not later than 8:30 A. M. When plaintiff was required to act in a role in which she had been cast, it was absolutely necessary that she should be on the ground in time to commence work with the others, if defendant was not to be inflicted with considerable financial loss. If the situation as depicted by defendant's witnesses be true—plaintiff's frequent tardiness and the great difficulty encountered at times in getting word to her—there could be neither system nor reasonable efficiency in defendant's business unless it made some such order as that which it gave plaintiff on January 22, 1916. Defendant's business could be expedited only by a compact working entity of all its employees, commencing their work in unison and at a reasonably early hour in the day.

[7] We conclude, therefore, that the order to report at the studio every morning not later than 8:30 was consistent with the contract between the parties; that, if the circumstances were as described by defendant's witnesses, the order was reasonable and fair; and that the court erred in charging the jurors that it was for them to determine whether the order "was within the terms of the contract" and whether it "was a reasonable order under the circumstances." The jury should have been instructed specifically that if it be true, as testified by defendant's witnesses, that plaintiff was frequently tardy, and defendant, at times, had difficulty in reaching her by telephone in order to notify her to be present to enact her roles, then the order was reasonable, and a willful disobedience of its terms would be good ground for plaintiff's discharge. Instead, the jury was, in effect, told that a willful disobedience of the order is not a defense to plaintiff's action. In its charge to the jury the court gave this instruction: "If the defendant did not have any general rules and regulations applying to actresses in its employment, enacting roles and acting parts in its producing company, the same as plaintiff was enacting, which required such actresses to report at the studio of the defendant every morning not later than 8:30 A. M., irrespective of whether they were cast or not, and the defendant had not notified plaintiff to report for rehearsals on January 24th, January 25th, or January 26th, or any of such dates, and the defendant had not instructed the plaintiff to direct or act in any particular part or given

to plaintiff any particular cast or assignment on January 24th, 25th, or 26th, or on any other said date, then by failing to report at the studio of the defendant on said January 24th, 25th, or 26th, the plaintiff did not commit a breach of the contract which she has declared on in her complaint, and the plaintiff would not on that account be prevented from recovering in this action.'' This instruction entirely ignores the order of January 22, 1916, and the effect of any willful disobedience thereof. Indeed, throughout its instructions, the court, apparently adopting the theory advanced by respondent on this appeal, seems to have treated the order as wholly inconsistent with the contract of employment. In this we think the court erred.

[8] Since the case must be remanded for retrial, it is necessary that we notice one other objection. Appellant complains of an instruction respecting the amount of recovery. The action was not simply to recover plaintiff's wage of seventy-five dollars a week for the balance of her term of service. It was brought to recover damages for breach of the entire contract. Under her contract with defendant, plaintiff was to receive a salary of seventy-five dollars a week for her services as a motion picture actress and likewise one thousand three hundred dollars, payable in weekly installments of twenty-five dollars each, as a consideration for the optional right which she gave to defendant and which entitled it, at its option, to employ plaintiff for another year at an agreed salary. We shall assume, as contended for by defendant, that the contract is severable. That is, we shall assume that the agreement for services at a wage of seventy-five dollars a week for the first year is one agreement; that the agreement whereby plaintiff gave defendant the optional right to re-employ her for another year, in consideration of the sum of one thousand three hundred dollars, payable in equal weekly installments, is another and separate agreement; and that the aggregate of the amounts payable weekly to plaintiff during the first year, one hundred dollars, is the total amount payable under two separate and independent divisions of the contract. But, even so, if plaintiff is entitled to recover at all, she is entitled to recover for defendant's breach of the contract as a whole, not merely for a breach of defendant's agreement to employ her for a year at a wage of

seventy-five dollars per week. That is, if entitled to recover at all, she is entitled to recover at the rate of one hundred dollars per week for the remainder of the term of service, i. e., from January 27, 1916, to June 16, 1916, less such sum as she might have earned by exercising reasonable diligence to secure other employment of the same or a substantially similar character. Appellant seems to think that because it was under no obligation to exercise its optional right to re-employ plaintiff for another year upon the termination of the first year's service, it, therefore, should pay no part of the one thousand three hundred dollars that became payable after plaintiff's discharge, even if it should be found that it breached the contract by discharging plaintiff without just cause. This, manifestly, is *non sequitur.* Plaintiff, in consideration of one thousand three hundred dollars, payable in weekly installments of twenty-five dollars each, gave defendant an option. Defendant, unless plaintiff herself has breached the contract by insubordination or by willful disobedience of a reasonable order, must pay for this option the full amount that it agreed to pay therefor, and at the times and in the manner it agreed to pay, regardless of whether it might see fit to exercise the option that it acquired for the agreed consideration of one thousand three hundred dollars.

Judgment reversed.

Sloane, J., and Thomas, J., concurred.