[Civ. No. 4743. First Appellate District, Division One.—April 8, 1925.]

## C. W. EHLERS, Respondent, v. LANGLEY & MICHAELS CO. (a Corporation), Appellant.

[1] EMPLOYER AND EMPLOYEE—TERMINATION OF EMPLOYMENT WITHOUT NOTICE—JUSTIFICATION FOR—EVIDENCE—FINDINGS.—In this action by an employee, who was dismissed from his employment without notice and in alleged violation of the terms of the contract of employment requiring a thirty-day notice to be given before the employment could be terminated, against his employer to recover the amount of salary and commissions he would have received if he had been allowed to remain in such employment during the thirty-day period following his discharge, the evidence was sufficient to support the findings of the jury against the contention of the employer that it was an office rule of the latter, known to plaintiff, who was the manager of the department conducted by the employer for the sale and installation of drugstore fixtures, that no part of the work of a subcontractor, to whom contracts for the manufacture and installation of fixtures might be sublet by the employer, should be paid for until the entire contract was completed and a written acceptance of the work received from the customer, and that before the work of a subcontractor on a particular job was completed, plaintiff fraudulently procured a written acceptance of the work from the customer, and that therefore his summary dismissal was justified.

[2] ID.—NOTICE—CHARACTER OF VIOLATION BY EMPLOYEE.—While willful disobedience by the servant warrants peremptory dismissal

---

2. Duty of servant to obey master's orders, note, 24 L. R. A. (N. S.) 814.

Right to discharge employee for disobedience of rules or orders of master, notes, Ann. Cas. 1916A, 1027; 37 L. R. A. (N. S.) 950. See, also, 18 R. C. L. 520; 16 Cal. Jur. 961.

by the master, nevertheless before the law will allow an employer to ignore the specific terms of a contract of employment which requires notice to be given the employee of its proposed termination it must appear that there has been some rule, order, or instruction of the employer violated and that such violation was committed willfully and deliberately on the part of the employee.

[3] ID.—INTENTIONAL VIOLATION—BREACH OF DUTY—REMEDIES.—Although it is not necessary that the violation be perverse or malicious, or that it be the result of an evil intent toward the master, it must be made clear that the thing done or omitted to be done was done or omitted intentionally, the rule being grounded upon the theory that willful disobedience of specific instructions of the master, if such instructions be reasonable and consistent with the contract of employment is a breach of duty—a breach of the contract of service; and like any other breach of contract, of itself, entitles the master to renounce the contract of employment.

[4] ID.—BREACH OF DUTY—NOTICE—FINDING—EVIDENCE.—In such action, the jury was justified in concluding that there was no breach of duty on the part of plaintiff, and therefore he was entitled to the benefit of the thirty-days' notice provided for in the contract of employment.

(1) 39 C. J., p. 104, n. 96.    (2) 39 C. J., p. 87, n. 39.    (3) 39 C. J., p. 86, n. 35.    (4) 39 C. J., p. 104, n. 96.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. H. L. Preston, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

McCutchen, Olney, Mannon & Greene for Appellant.

A. J. Treat and T. F. Draper for Respondent.

KNIGHT, J.—The plaintiff, an employee of the defendant corporation, was dismissed from his employment without notice, and later brought this action to recover the amount of salary and commissions accruing during the thirty-day period following his discharge, contending that such summary dismissal was in violation of the express terms of the contract of employment, which he claims required a thirty-day notice to be given before the employment thereunder could be terminated. The action was tried by a jury, resulting in a verdict in favor of the plaintiff for the sum

of $814.57, that being the amount of salary and commissions plaintiff would have received if he had _been allowed to remain in such employment for the additional thirty days. Judgment was entered upon said verdict and defendant appeals.

The contract of employment was made up of certain letters which passed between the parties. Those letters were afterward lost or destroyed and, consequently, the terms of the contract were established by secondary evidence. Appellant concedes that the evidence adduced at the trial in relation to the contents of said letters was conflicting and for that reason has not urged on this appeal the point that said contract of employment did not require the giving of the thirty-day notice contended for by respondent.

The main contention upon which appellant seeks a reversal of the judgment is grounded upon the principle of law that it is the duty of the servant to obey all lawful and reasonable orders and instructions of the master, and that willful disobedience thereof warrants peremptory dismissal. (Civ. Code, secs. 1981, 2000; *Wiley* v. *California Hosiery Co.*, 3 Cal. Unrep. 814 [32 Pac. 522] ; *May* v. *New York Motion Picture Co.*, 45 Cal. App. 496 [187 Pac. 785].)

The appellant company is engaged in the wholesale drug business in San Francisco, and in connection therewith conducts a department for the sale and installation of drugstore fixtures, of which department respondent had been the successful manager for two years. The controversy here arose over certain contracts secured by the appellant company for the manufacture and installation of fixtures, and the performance of certain construction work for a firm in Petaluma, which contracts were, in accordance with the usual custom of appellant company, sublet on this occasion to the Mullen Manufacturing Company of San Francisco, to whom it had previously sublet similar contracts.

[1] Appellant contends that it was an office rule of appellant company, known to respondent, that no part of the work of the subcontractor should be paid for until the entire contract was completed and a written acceptance of the work received from the customer; that before the work of the subcontractor on this particular job was completed, respondent fraudulently procured a written acceptance of the work from the customer, contrary to business morals

and injurious to appellant's business standing and reputa-
tion, and that therefore the summary dismissal of respond-
ent was justified.  Respondent denied that he had practiced
any fraud or deceit whatever in obtaining written ac-
ceptance of said work, and further denied that there was any
such rule as appellant contends for in operation at the
time the Petaluma transaction occurred.  These disputed
questions of fact were resolved by the jury in favor of re-
spondent, and we are of the opinion that the jury's con-
clusions find ample support in the evidence.

Testimony was given by respondent to the effect that some
eight months previous to the dispute concerning the Peta-
luma job, the appellant company installed certain fixtures in
a drugstore in Oakland under a contract which also had
been sublet to the Mullen Company; that at that time the
impracticability of the rule requiring a written acceptance
to be secured from the customer before any of the work of
the subcontractor was paid for came into question and was
discussed by respondent with Mr. Pattioni, the vice-president
and manager, and Mr. Norton, the secretary of appellant
company; that the discussion arose on account of the ob-
jections made by Mullen, who asserted that it was impossible
for him to accept contracts subject to such a rule for the
reason that the customer might, for some fanciful reason,
refuse to accept the work at all and in that event he, as the
subcontractor, would never be paid.  Respondent further
testified that following said discussion it was understood
by said corporation officers that written acceptances from
the customer would not be insisted upon; and that thereafter
said acceptances were not, in fact, procured, although com-
pletion of the work was always required as a condition prece-
dent to payment.

The particular circumstances relating to the Petaluma job
were as follows: The entire job was covered by three con-
tracts, the first of which was the main agreement and called
for the manufacture and installation of fixtures to the extent
of $5,625, of which amount appellant received $1,400 when
the contract was signed; the second contract specified certain
paneling for a fixed price of $1,020; the third contract, an
oral one, related to screens and window-backs.  The fixtures
were manufactured and assembled by the Mullen Company

at its factory in San Francisco, and shipped to Petaluma. After installation work under the first contract and construction work called for by the additional ones had been in progress for a week or nine days, and the work under the first contract had been practically finished, respondent, following his usual practice, so reported to Mr. Norton, the secretary, stating that Mullen would like to have his check delivered in time to meet his pay-roll on the following Saturday, May 13th. Norton replied that the check would be ready. On May 12th, Norton told respondent that Mr. Michaels, the company's president, had seen the check lying on the cashier's desk and had stated that it should not be delivered until a written acceptance was obtained from the customer. Respondent so informed Mullen and the latter protested that the delay would work a hardship on him because he had depended on said check to meet his pay-roll. In order to obviate the embarrassment, respondent that night personally inspected the work at Petaluma, ascertained that the material called for by all three contracts was on the job, and that the work under the first contract had been practically completed; that the only thing remaining to be done was to shove the showcases into position "like you would a table or desk"; thereupon respondent obtained from the customer the necessary written acceptance, which was filed in the company's office and the next day the Mullen check for the sum of $4,200 was delivered to Mullen.

About ten days later respondent was called before a meeting of four of the officers of the appellant company, those present being Mr. Michaels, the president; Mr. Pattioni, the vice-president and manager; Mr. Norton, the secretary; Mr. Terry, the treasurer; also the company's sales manager; and a member of the drug firm for whom the work was being done. After some questioning, respondent was arbitrarily discharged from his employment by the president, Mr. Michaels. He was first asked by Michaels if he did not know that it was against the rules of the company to pay the accounts of a subcontractor without first obtaining a written acceptance from the customer and he replied that he did not. Respondent then explained that the same difficulty had arisen in reference to the Oakland job and that the understanding at that time with the company's officers was

that said rule should be relaxed.   He further attempted to
explain how the appellant company was being benefited by
prompt payment to the subcontractor upon completion of
the work  without awaiting the customer's acceptance.   In
this connection respondent stated that the success of the de-
partment depended largely upon pleasing the customer; that
in the performance of all contracts for the manufacture and
installation of fixtures the customer invariably requested
small extras not included in the contract; also that it was
frequently the case that several days after the job had been
completed and accepted it would be found that a drawer
would stick or a door would jam, owing to shrinkage of
material; that if the subcontractor was paid promptly upon
completion of the work, and was thereby able to take care of
his current demands for labor and material, he was always
willing to go beyond his contract and perform these small
extra jobs without cost to either the customer or the appel-
lant company.   Respondent testified that upon explaining
these matters to Mr. Michaels the latter said ''he did not
care anything about that; what he wanted to know was
whether or not I had received instructions not to pay it—
any bills on any occasion—pay any bills until we had received
an acceptance from the customer.''   Continuing, respondent
testified: ''I tried to explain as I did to you now and he
didn't want any explanation, he wanted an answer 'yes' or
'no.'   Well, I said yes, I did receive those instructions, then
he said this remarkable thing, that because I have violated
those instructions, and seem so anxious to pay Mr. Mullen
that money, that I was more loyal to Mr. Mullen than I
was to him, and therefore had lost all confidence in me and
having lost confidence in me, there wasn't any room for
he and I under the same roof.   Those were his very words.
. . . Then I asked him if that meant I was through work-
ing for him and he said 'it does.'   I told him then that I
did not believe that he had lost confidence in me, he was the
first man that ever in my life had told me that.   I left
the company.''
     It would thus appear from respondent's testimony, which,
in view of the verdict of the jury in his favor, must be
taken as true, that the rule upon which the president of
appellant company assumed to stand in the matter of the

peremptory discharge of respondent, was not effective at the time the Petaluma transaction occurred, but had been suspended several months prior thereto, with the express approval of the officers of said company. And so far as the special instructions of Michaels were concerned, to the effect that the Mullen check be withheld until written acceptance was obtained, the evidence shows, without dispute, that those instructions were complied with. But in this regard appellant claims that said acceptance was procured through fraud and deceit. The evidence does not so prove, and we think the jury was fully justified in deciding adversely to appellant upon this issue. Even construing the testimony of the witness Tuttle, who signed the acceptance, most strongly against respondent, it utterly fails to show that said acceptance was the product of any deception whatever. The work under the first contract for which the check was delivered in payment was at that time practically finished. Even Tuttle testified that the things remaining to be done were comparatively trifling. The reason said work was not entirely finished, respondent testified, was that Mullen's men had been working on the second and third contracts. Tuttle knew, however, of the true conditions when said acceptance was signed, and the mere fact that he believed from respondent's statement that it was Michaels who requested the acceptance, cannot be considered as a reflection upon the integrity of respondent. On the other hand, respondent testified that he truthfully explained to Tuttle the situation of Mullen's approaching payday, his reliance upon the check to meet it, and that Michaels had insisted upon the acceptance before the delivery of the check; that thereupon Tuttle said, ''Certainly I will sign it.'' There is nothing in the record which tends to prove that respondent's action in securing said written acceptance resulted in any personal gain to him or that it operated to the injury of the customer or to the prejudice of appellant company, which of itself may be taken as negative proof of the charge of fraud made by appellant. The entire job was afterwards satisfactorily finished and the small extra jobs requested by Tuttle when he signed the acceptance were performed by Mullen without cost.

In further justification of the payment to Mullen, it was shown that as subcontractor Mullen had no contractual relations with the customer and was, in fact, entitled to his money when his work was completed; that he had expended large sums of money in the manufacture of the fixtures and incurred labor bills in the installation of the same; that there was no agreement on his part that he should wait until the customer had accepted the work before he received any part of his pay; that up to that time he had received no money whatever, although the appellant company had received $1,400 in cash from the customer at the time their contracts were signed.  The evidence further shows that during the two years respondent managed said department, the business thereof increased about twenty per cent in volume, amounting during the second year to about $200,000 gross.  In fact, appellant states that there is no criticism raised as to his general conduct of the department.

[2]  While it is doubtless the law, as appellant contends, that willful disobedience by the servant warrants peremptory dismissal by the master, nevertheless before the law will allow an employer to ignore the specific terms of a contract of employment which requires notice to be given to the employee of its proposed termination it must appear that there has been some rule, order, or instruction of the employer violated and that such violation was committed willfully and deliberately on the part of the employee.  [3]  Although it is not necessary that the violation be perverse or malicious, or that it be the result of an evil intent toward the master, it must be made clear that the thing done or omitted was done or omitted intentionally (*May* v. *New York Motion Picture Co., supra*), the rule being grounded upon the theory that willful disobedience of specific instructions of the master, if such instructions be reasonable and consistent with the contract of employment, is a breach of duty—a breach of the contract of service; and like any other breach of contract entitles the master to renounce the contract of employment.  (Labatt's Master and Servant, 2d ed. sec. 291, p. 877.)

[4]  Under the circumstances and for the reasons above stated we believe the jury was justified in concluding that there was no breach of duty on the part of plaintiff, and

therefore he was entitled to the benefit of the thirty-days' notice provided for in the contract of employment.

Judgment affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 3, 1925.