[Civ. No. 6752. Second Appellate District, Division Two.—November 19, 1931.]

JETTA GOUDAL, Respondent, v. CECIL B. DeMILLE PICTURES CORPORATION, Appellant.

Neil S. McCarthy, Earl L. Banta and Howard P. Hall for Appellant.

W. I. Gilbert and Howell Purdue for Respondent.

FRICKE, J., *pro tem.*—This is an appeal from a judgment for plaintiff in the sum of $34,531.23 in an action to recover damages for breach of a contract of employment entered into in April, 1925. Under this agreement respondent was employed by appellant as a motion picture actress for one year beginning May 19, 1925, with the option to appellant of four yearly extensions of the contract, each

yearly extension to be at a specified substantial increase in compensation. Respondent entered upon her duties and appellant twice exercised its option, extending the period of employment to May 18, 1928. On September 10, 1927, respondent was discharged by appellant. ▆ The basic question in this case is whether such termination of the employment of respondent was wrongful or whether it was justified by acts of the respondent violative of the terms of the contract. The trial court found that respondent had not violated the contract and that her discharge was not justified.

Many of the alleged violations of the employment contract set forth in appellant's brief are either not supported by the references to the transcript due either to counsel drawing inferences not justified by the testimony or to the fact that the references are to the testimony of Cecil DeMille as to what he told respondent had been reported to him, testimony which, while perhaps admissible on another theory, is pure hearsay so far as its being proof of the conduct of respondent is concerned. As an example of the misinterpretation of the evidence may be cited appellant's statement that "Mr. Howard testified that in two specific instances she refused to follow the directions of the director." When we examine the reference to the transcript we find the testimony of Mr. Howard to be that in one scene Miss Goudal appeared disturbed and did not perform the scene as he thought her capable of performing it and that, in another instance, "She played the scene in a manner well enough for me to accept it and put it in my picture as a part of the picture but not in a manner I think fully as good as she was capable of playing it." Even the viewing of the testimony through the rose-colored glasses of the advocate can hardly justify counsels' statement that this was a *refusal* to perform a part of the contract.

The claim that respondent failed or refused to perform her parts as requested is based upon many incidents set forth in detail in the record. They relate to occasions when the respondent, instead of unquestioningly performing as directed by the director in charge, called attention to inconsistencies, inaccuracies, possible improvements, or lack of artistic quality in the performance called for as they appeared to her. In some instances this resulted in the suggested change being made by the director without argument;

in other cases the change was made after some argument between them. In most instances where the director did not make the suggested change it appears that respondent took the question up with the president of the appellant corporation and in a substantial number of instances he agreed with her and the changes were made. In other instances he did not agree. This presents the question, was respondent compelled by the contract to go through her scenes as a mere puppet responding to the director's pull of the strings, regardless of whether or not he pulled the right or the wrong string, or was she called upon by the language and spirit of the contract to give an artistic interpretation of her scenes, using her intelligence, experience, artistry and personality to the ultimate end of securing a production of dramatic merit? We believe that the latter is the correct interpretation. Suggestions and even objections as to the manner of enacting the various scenes, when made in good faith, were in the interest of the employer; in fact it appears from the testimony that they were welcomed and encouraged in many instances and, prior to commencing work, the president of appellant informed respondent that he did not want mannikins to work for him, that he wanted thinking people, and that, if she would explain to him why she wanted to do a thing in a particular way, he would appreciate it. By the very wording of the contract "it is agreed that the services of the artist herein provided for are of a special, unique, unusual, extraordinary and intellectual character". Even without the evidence contradicting that of appellant, the trial court was more than justified in finding that it was not true that respondent had refused or failed to perform her part of the contract.

Some of the incidents, stressed by appellant as instances of a failure of respondent to perform her contract, turn out, when reference is had to the transcript, to be dependent upon the opinion of the director as to whether respondent performed to the best of her ability; others were dependent upon the feeling of the particular director as to whether he was or was not satisfied. The declarations of several of the directors as to their dissatisfaction with the work of respondent are rather inconsistent with the testimony elsewhere of one of them that the picture "White Gold" in which respondent performed under his direction was "the best pic-

ture I ever will make", and the testimony of the director of her last picture, that he considered it one of his best American pictures. When considering the testimony of the directors who expressed dissatisfaction with the performance of her parts by respondent one may well wonder who was temperamental and out of step when we note in connection therewith that in the picture in which Cecil DeMille directed Miss Goudal there was no trouble whatever. There is, furthermore, a conflict in the evidence as to whether the performance given by respondent was to the best of her ability and of an artistic character. In this conflict the trial court was fully sustained in its findings against appellant.

The remaining ground urged as justifying her discharge is that respondent on certain occasions was late in arriving on the sets at the time designated by her employer. The instances cited were explained by the testimony for respondent as being due, not to any neglect or intentional absence, but to duties relating to costumes which had been voluntarily assumed by respondent with the approval of appellant though not required by the contract, delays in appearing on the set due to the necessary consumption of time in the donning of a special wig, and in the last picture, the only one made after the exercise of the last option by appellant to re-employ respondent for another year, delays due to the large number of costumes used, in one instance, a failure of her maid who forgot an article of clothing, and the delay of appellant in delivering to respondent the script, which determined the costumes required. It should also be noted that as to this last picture the director in charge, when respondent expressed regret at being late, stated to her that he understood and that never before had he had as little trouble as he had with her. The case of *May* v. *New York Motion Picture Corp.*, 45 Cal. App. 396 [187 Pac. 785], so strongly relied upon by appellant is easily distinguishable from the case at bar. The fact that the maximum salary under the contract of the plaintiff there was $125 per week as compared to the maximum salary of respondent of $5,000 per week sufficiently discloses the comparative skill of the respective artists. In that case also the plaintiff repeatedly was from one and a half to two hours late in arriving at the place of employment, on at least one occasion failed to appear after she had been notified by telephone and on the

three days preceding her discharge failed to appear for work at all, her reason for not appearing on those days being that her contract did not require her presence, a reason not sustained by the court's interpretation of the contract. The May case involved the wilful disobedience of a reasonable order incident to the employment justifying the plaintiff's discharge. There is in the case at bar no wilful tardiness nor invalid excuse for absences, the instances of tardiness here being covered by the general description that those delays were occasioned by the requirements of the scenes to be enacted on those particular days, delays while respondent was actually engaged in performing her employer's business.

It may also be noted that the references to alleged breaches of the contract consist largely of incidents prior to May, 1927, when appellant, for the second time, had exercised its option to continue and extend the contract for another year, and by which time respondent had completed seven of the eight pictures in which she performed for appellant. It is rather difficult to reconcile as sincere the appellant's criticism and faultfinding as to respondent's services in the pictures made during the two years prior to May, 1927, with the fact that in that month appellant voluntarily availed itself of its option to secure the talents and services of respondent for another year. Particularly is this significant when we consider that the salary under the latter option would amount to $39,000 more than respondent's salary for the preceding year. This circumstance alone would fully justify the trial court in considering as of little or no weight the testimony as to alleged breaches of contract prior to May, 1927. The exercise of the option not only evinced a desire on the part of appellant to retain respondent's services, but expressed an approval of the manner in which she had performed her services in the past and was an indication that a continuation of the former services was desired. Having thus placed the stamp of approval upon respondent's conduct and services as rendered prior to May, 1927, it is not reasonable that a continuance of such services and conduct was unsatisfactory and, from appellant's viewpoint, constituted a breach of the contract warranting respondent's discharge. Furthermore, the exercise of the option may be considered as a declaration by act that the past conduct of the artist was not such conduct as was intended by the con-

tracting parties as a justification for the termination of the contractual relations. This would be particularly true where, as here, the duties of the performing party are described in the contract by such general phraseology as that the artist shall render the services "conscientiously" and "artistically". It might well be said that an artist who performed her part as directed without remonstrance or suggestion, in spite of the fact that the action was inartistic, crude and illogical, would not be rendering services either conscientious or artistic in character while the artist who made an effort to secure a change in the action to produce an artistic result would be complying with the letter and spirit of the contract. These matters and the intent and good faith of the respondent were matters of fact to be passed upon by the trial court and, since their decision adversely to appellant is sustained by the evidence the findings of the trial court are not subject to review here.

To constitute a refusal or failure to perform the conditions of a contract of employment such as we have here, there must be, on the part of the actress, a wilful act or wilful misconduct *May* v. *New York Motion Picture Co.,* 45 Cal. App. 396 [187 Pac. 785]; *Ellers* v. *Langley & Michaels Co.,* 72 Cal. App. 214, 221 [237 Pac. 55], a condition which is absent when the actress uses her best efforts to give an artistic performance and to serve the interests of her employer. The trial court was fully warranted by the evidence in finding that respondent neither failed nor refused to perform the services required of her under the contract.

Even in the most menial forms of employment there will exist circumstances justifying the servant in questioning the order of the master. Would the discharge of a ditch digger be justified if, instead of immediately driving his pick into the ground at the point indicated, he in good faith suggested to the employer that the pipes they were to uncover lay on the other side of the highway? And when the employment is of the services of "a special, unique, unusual, extraordinary and intellectual character", as is agreed by the contract here under consideration, to be rendered "conscientiously, artistically and to the utmost of her ability" sincere efforts of the artist to secure an artistic interpretation of the play, even though they may involve the suggestion of changes

and the presentation of argument in favor of such changes, even though insistently presented, do not amount to wilful disobedience or failure to perform services under the contract, but rather a compliance with the contract which basically calls for services in the best interests of the employer. What may in the case of the extra girl be rank insubordination because of a refusal to do exactly what she is ordered to do by a director may be even praiseworthy co-operation in the interests of the employer when the refusal is that of an artist of the exceptional ability expressly stipulated in the contract here before us.

█ Appellant's final point is that respondent is precluded from recovery because, after her discharge, she failed to seek other employment. The testimony of respondent is that after her discharge she held herself in readiness to perform her part of the contract and did not try to secure employment elsewhere. We are referred to no evidence, and appellant's brief concedes that there is none, that respondent could, with reasonable diligence, have secured other suitable employment during the remaining period of the agreement other than, as found by the trial court, that, after the first day of January, following her discharge, it should have become evident to her that appellant would not accept her services and that the circumstances showed that she did not diligently seek other employment which she could have obtained. Under this finding the trial court limited the recovery to the period ending January 1, 1928, and, pursuant to a stipulation, deducted therefrom the sum of $3,000 received by respondent from other employment.

"The measure of recovery by a wrongfully discharged employee is generally and primarily . . . the agreed wage for the unexpired part of the term, and the burden is upon the employer to rebut this presumption by proof that the damages sustained were actually less." (*Gregg* v. *McDonald,* 73 Cal. App. 748, 757 [239 Pac. 373, 376].) "The measure of damages in such cases is the amount of salary agreed upon for the entire period of service, less the amount which the servant has earned or with reasonable effort might have earned from other employment." (*Boardman Co.* v. *Petch,* 186 Cal. 476, 484 [199 Pac. 1047, 1051]; *Seymour* v. *Oelrichs,* 156 Cal. 782, 801 [134 Am. St. Rep. 154, 106 Pac. 88].) The case last cited calls attention to the fact that,

where the action is brought before the expiration of the period of employment provided by the contract, the action is not to recover wages due, but for damages for breach of contract, and that "The measure of damages is therefore, *prima facie,* the contract price." The burden was on the defendant to show not only that respondent remained unemployed, but also that she could by diligence have secured suitable employment elsewhere. (*Rosenberger* v. *Pacific Coast Ry. Co.,* 111 Cal. 313, 318 [43 Pac. 963].) Conceding that the proof would warrant the inference that respondent did not seek other employment, such proof would not establish that respondent could have secured other employment. Appellant failed to sustain the burden placed upon it by the law, and there is no proof which would warrant a reduction in the amount of damages awarded by the judgment.

Appellant has moved this court for an order of diminution of the record to bring before this court the order of the trial judge that "The defendant's answer is ordered amended to conform to the proof by inserting therein an allegation that since January 1, 1928, the plaintiff did not diligently seek other employment which she might have obtained at the same salary." As the judgment of the trial court did not allow to the plaintiff any amount for damages after January 1, 1928, it becomes immaterial here whether such amendment was ordered or not and the motion is denied.

The judgment is affirmed.

Craig, Acting P. J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 19, 1931, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 18, 1932, and the following opinion was rendered thereon:

THE COURT.—The petition for a hearing is denied. A perusal of the evidence discloses that in no instance was any final order of the employer disobeyed by the plaintiff and it cannot therefore be said that the conclusion of the

District Court of Appeal that the findings are supported by the evidence is erroneous. It should be stated, however, that we do not wish to be understood as approving any declaration in the opinion unnecessary to or inconsistent with this one ground of affirmance of the judgment.