**Milton JOUFLAS, Plaintiff and Appellant,**

v.

**FOX TELEVISION STATIONS, INC., Defendant and Appellee.**

No. 950162.

Supreme Court of Utah.

Nov. 15, 1996.

M. David Eckersley, Salt Lake City, for plaintiff.

Walter F. Bugden, James E. Morton, Jacquelynn Davis, Salt Lake City, and Gary Roberts; Ann Calfas, Los Angeles, CA, for defendant.

HOWE, Justice:

Plaintiff Milton Jouflas appeals from the trial court's judgment in favor of defendant Fox Television Stations, Inc. (Fox), on plaintiff's action for breach of his employment contract.

## FACTS

In April 1990, Fox acquired KSTU, a Salt Lake City-based television station, from Mountain West Television, including KSTU's most significant asset—its license to broadcast. As an assignee of the license, Fox was subject to all terms and conditions imposed by the Federal Communications Commission upon the original licensee, Mountain West Television. Fox retained the employees who staffed the station. On or about May 15, Fox entered into a three-year employment agreement with Jouflas, the Mountain West general manager, making him general manager and vice president of KSTU–Fox. The par-

ties specified that the contract would be governed by California law.

At all times relevant, Fox had a policy of prohibiting sexual harassment in the work place. Soon after the acquisition, Jouflas's name appeared on a memorandum banning "Playboy type" pinups as impermissible sexual harassment, and the trial court found that he was aware of the policy. Jouflas signed the Federal Communications Commission's equal employment opportunity program certification that KSTU–Fox engaged in no discrimination on the basis of race, color, religion, national origin, or sex. The accompanying model program listed him as the person responsible for implementation.

During the summer of 1990, Fox received reports of sexual harassment of female employees and misuse of company funds by Jouflas. This information was of particular concern to Fox because renewal of the station's license was conditioned in part upon satisfaction of the federal equal employment opportunity requirements. In response, the vice president of personnel for Fox, Jean Fuentes, conducted an investigation from which Fox concluded that Jouflas had engaged in serious misconduct, including sexual harassment of female subordinates, disloyalty to Fox, misappropriation of company funds, sexual favoritism, and retaliation. Jouflas's pattern of misbehavior had begun before the acquisition but continued after he entered into his contract with Fox. Following the investigation, Fox terminated Jouflas's employment, and he brought this suit against Fox for breach of contract.

In the ensuing bench trial, the court considered extensive and conflicting testimony and explicitly resolved issues of credibility in favor of Fox. The court found that after entering into his personal services contract with Fox, Jouflas subjected Fox employees to a work environment which was conditioned on whether the employees "got along with Jouflas." It found that employees who "fit in" would be included in meetings, consulted, and respected. On the other hand, employees who did not conform to Jouflas's personal whims would routinely be ignored, shunned, and/or communicated with through notes and messages rather than through in-person con-

tact. Finally, employees who refused to "go along with Jouflas" were subject to retaliation which did not include job loss, but did include the silent treatment and other conduct that rendered the work environment difficult and uncomfortable.

The trial court found that "[u]nder any objective analysis, the sexually explicit conversation which was the norm at KSTU under the Plaintiff's direct leadership was offensive [and] inappropriate in a work environment." In addition, Jouflas's conduct included favoritism, or at least the appearance of favoritism, on repeated occasions to attractive female employees, especially promotion manager Devi Fournier. His behavior gave the impression that she in particular and other favored employees were rewarded in the work environment for participating with him in creating an atmosphere where sexually explicit conversation and conduct flourished. The court found that Jouflas gave Fournier credit cards, contrary to Fox policy, instructing her not to tell. anyone about it.[1] Moreover, he made comments to her in the presence of other employees, such as "You look awesome," "I love your lips," "You have great wheels," and "You should hear the dream I had about you last night." The court noted that Fox offered into evidence a note from Jouflas to Fournier commenting on her "sensational!!!" appearance, with instructions to destroy the letter after reading it. . The court found that "[t]hese comments were uninvited, unappreciated, and inappropriate under any circumstances in the workplace." The court further noted that employees looked to Jouflas, as general manager, to " 'set the tone' for the station, both by way of example and by terminating inappropriate conduct."

The trial court also found that Jouflas appropriated Fox assets for his personal use or the use of other employees without authorization. This misuse of company assets included the purchase of a new suit for himself from a local clothing store using credit for air time provided by KSTU, plane fare to Las Vegas for an employee when the trip had no visible business purpose, personal accommo-

dations in Sun Valley, Idaho, paid for through an air-time trade with Fox which was neither approved nor reimbursed, and additional accommodations in Sun Valley several months later. All of these incidents took place subsequent to May 1, 1990, after Fox acquired KSTU.

In addition, the trial court found that when Steven LeBlang, the vice president of Fox's programming department, called personally to instruct KSTU to change the airing time of "A Current Affair," Jouflas disagreed "adamantly" with the decision and exclaimed "[expletive deleted] LeBlang and [expletive deleted] Fox." Second, Jouflas ignored Fox's charitable donations policy that any contribution of over $500 must be cleared with Fox. When he wrote a personal check for $600 to a charity golf tournament and sought reimbursement from the station, Wayne Marion, the business manager and controller, reminded him of the approval requirement. Marion testified that when he showed Jouflas a copy of the Fox policy, "[h]e blew up, he hit the ceiling, and he basically said do it my way, do it just exactly the way I told you." When Marion instead submitted the check and accompanying documentation according to policy, Jouflas called Marion into his office and, according to Marion's testimony,

> basically he exploded more. He went red-faced. He got up around his desk. He came over and put his face about [a foot away].... He proceeded to ream me a new one. He chewed me out royally, this was under his purview, I was to do it the way he said to do it.... It was very intimidating, to say the least.... [H]e was red-faced, he was mad, shouting, and it was all right there in my face.

A number of employees corroborated Jouflas's breach of financial policies, unauthorized air-time trades, hostility to Fox, discriminatory treatment of the female employees, retaliatory behavior, and violation of Fox policies. The station personnel manager testified that Jouflas instructed her and other employees not to talk to Fox unless he cleared it first. "He told the staff that he was in charge and would always be in

---

1. Fournier returned the credit cards upon learn-    ing of the violation.

charge, regardless of what Fox said. He also said that he would run the station in the manner that he saw fit."

The trial court's factual findings included seven pages of excerpts of trial testimony relating to the above issues. The court noted that all of the events which gave rise to the termination occurred after plaintiff entered into his employment contract with Fox. Moreover, the trial court admitted evidence from the period before the execution of the employment contract, under Utah Rule of Evidence 404(b). The most influential piece of precontract evidence cited was a letter from Jouflas to Fournier, stating, "You are more than a fantasy, you have become my passion. . . . You could also go a long way in this company if you would cooperate with a sexual favor from time to time," and suggesting times and places for such trysts. Jouflas alleged that the letter was written as an April Fool's joke, but Fournier testified: "I didn't think it was funny. It scared me to death." The court stated that it received the precontract evidence solely for the limited rule 404(b) purpose of considering plaintiff's motives, intent, preparation, plan, knowledge, and absence of mistake and that no conclusion of law was premised upon any of the earlier conduct.

The trial court concluded that any breach of FCC equal employment opportunity laws could result in the revocation or nonrenewal of Fox's broadcasting license and that the precontract evidence was properly admitted under Utah Rule of Evidence 404(b) in that it "aided the Court as trier of fact to see that the Plaintiff had engaged in a pattern of behavior and that the post-contract conduct . . . was neither harmless nor innocent . . . when viewed in the context of historical events and Plaintiff's sexually charged relationships with various subordinate female employees." Nevertheless, the trial court stated at the close of the trial that no single post-contract incident rose to the level of sexual harassment. Consequently, the court did not specifically rely on sexual harassment in its conclusion that Jouflas had willfully breached his duties, including a duty of loyalty, that Fox properly terminated his employment, and that he therefore was not entitled to any relief.

Jouflas appeals, contending that the trial court erred in sustaining his termination because the evidence fails to support his violation of any rule, order, or instruction of his employer as required to constitute grounds for dismissal under California law. He also argues that the trial court committed prejudicial error in admitting evidence of his precontract conduct. For purposes of analysis, we will review his contentions in reverse order.

## ANALYSIS

### A. Admissibility of Precontract Evidence

Although California law governs the contract, the Utah Rules of Evidence "govern the proceedings in the courts of this state." Utah R. Evid. 101. Jouflas argues that the trial court committed prejudicial error in admitting evidence of events which predated his contract with Fox, that the trial court "lost focus" of the limitation on the evidence, and that "[t]he trial court's reliance upon irrelevant evidence in making its factual findings renders its conclusions based upon such findings erroneous as a matter of law." We find no error. The trial court was faithful to its stated reason for admitting evidence of Jouflas's precontract misconduct. For example, admitting evidence of Jouflas's 1988 "passion" letter to Fournier helped establish that the later, facially more innocuous post-contract note was part of a continuing fixation on Fournier that had begun earlier. Moreover, we have observed:

> [W]hen the trial is to the court, his rulings on evidence need not be subjected to quite such critical scrutiny as when it is to the jury, because in arriving at his conclusions upon the issues he will include in his consideration of them his knowledge and his judgment as to the competency, materiality, and effect of the evidence.

*In re Baxter's Estate*, 16 Utah 2d 284, 288, 399 P.2d 442, 445 (1965). Furthermore, "[a]n erroneous decision to admit or exclude evidence does not constitute reversible error unless the error is harmful." *Cal Wadsworth Constr. v. City of St. George*, 898 P.2d

1372, 1378 (Utah 1995) (citation omitted). We have found that an error is harmful only if the likelihood of a different outcome in the absence of the error is "sufficiently high so as to undermine confidence in the verdict." *State v. Knight,* 734 P.2d 913, 920 (Utah 1987). Jouflas fails to go beyond mere speculation in attempting to show a probability that the outcome would have been different absent the precontract evidence. Therefore, we conclude that he suffered no prejudice in any event.

### B. Willful Breach of Duty

[3–6] The trial court concluded that Jouflas "willfully breached his duties during the course of his employment with Defendant, including [his] duty of loyalty," and that consequently Fox's termination of Jouflas was sustainable under California law. We review the trial court's conclusions of law for correctness, granting them no deference. *Bagford v. Ephraim City,* 904 P.2d 1095, 1097 (Utah 1995). However, we review the factual findings of a trial court under the clearly erroneous standard. "For a reviewing court to find clear error, it must decide that the factual findings made by the trial court are not adequately supported by the record, resolving all disputes in the evidence in a light most favorable to the trial court's determination." *State v. Pena,* 869 P.2d 932, 935–36 (Utah 1994).

[7] Jouflas specifically attacks a number of the trial court's factual findings, contending that some are "wholly unsupported by the evidence," and attempts to minimize or explain away others. However, an appellate court defers to the trial court's findings because "the trial judge has observed 'facts' such as the witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts." *C & Y Corp. v. General Biometrics, Inc.,* 896 P.2d 47, 53 (Utah.Ct.App.1995) (citing *Pena,* 869 P.2d at 939). The Tenth Circuit Court stated in *Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987), " 'A finding of fact may be deemed "clearly erroneous" only if the finding is without factual support in the record ... or if the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been made.' " *Id.* at 1414 (quoting *Colon–Sanchez v. Marsh,* 733 F.2d 78, 81 (10th Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984)). Here, the trial court's findings of fact and conclusions of law are based solely on clearly admissible post-contract evidence. The court permissibly resolved issues of credibility in favor of Fox, and the evidence detailed above amply supports the factual findings.

The record indicates that Fox had no *a priori* motivation to discharge Jouflas. Greg Nathanson, the president of Fox T.V., testified, "The first thing you try to do when you buy a new station ... the first and second and third most important thing is to make sure the general stays, the current general manager, if the station's doing well." KSTU was financially sound at the time of the acquisition, and Nathanson stated that eliminating Jouflas "would be the last thing I'd want to do." The very existence of the three-year employment contract evidences Fox's commitment to Jouflas.

Section 2924 of the California Labor Code, which governs the employment contract, provides:

> An employment for a specified term may be terminated at any time by the employer in case of any willful breach of duty by the employee in the course of his employment, or in case of his habitual neglect of his duty or continued incapacity to perform it.

The Ninth Circuit Court held in *Nuelsen v. Sorensen,* 293 F.2d 454, 461 (9th Cir.1961), that an "employment contract for a specified term, made in California, may be terminated only for a reason specified in section 2924 of the California Labor Code" and that in such a case, compensation for employee services may be cut off. *See Story v. San Rafael Military Academy,* 179 Cal.App.2d 416, 3 Cal.Rptr. 847, 848 (1960) (teacher who refused to perform dormitory duty came within ambit of rule and was lawfully discharged).

Jouflas, however, contends that the post-contract evidence at most demonstrates that his "conduct created uncomfortable working conditions for several of his subordinates," which he maintains is insufficient for termi-

nation of a fixed-term contract. He argues that his behavior did not fulfill the requirement that "it must appear that there has been some rule, order, or instruction of the employer violated, and that such violation was committed willfully and deliberately on the part of the employee." *Ehlers v. Langley & Michaels Co.*, 72 Cal.App. 214, 237 P. 55, 57 (1925). He cites *Goudal v. Cecil B. DeMille Pictures Corp.*, 118 Cal.App. 407, 5 P.2d 432, 435 (1931), for the proposition that "refusal or failure to perform the conditions of a contract of employment" requires "a willful act or willful misconduct," and he denies engaging in willful misconduct. This argument ignores substantial evidence to the contrary. The evidence demonstrates that Jouflas willfully violated Fox's "order or instruction" specifying the handling of trade credits, charitable donations, and programming sequences, as well as his general disregard for Fox's policies.

In addition, since Jouflas was aware of the memo relating to Fox's antiharassment policy and was the individual responsible for signing the federal equal employment opportunity certification form, his "previous encounter with the [policies] should have alerted him to [their] parameters." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340, 1346 (7th Cir.1995). He knew that Fox was required to comply with both the antiharassment policy and the requirements of the Equal Opportunity Employment Act to retain its licence and therefore these were "rules" of his employer. By ignoring the antiharassment policy and risking behavior which arguably fell below the standard required by the federal equal employment opportunity laws, Jouflas willfully and deliberately violated a rule of his employer. By so doing, he potentially endangered Fox's most essential asset, its broadcast license, as well as possibly exposing the station to substantial civil liability. An employee who knowingly puts the very existence and financial viability of his employer at risk breaches his duty to that employer.

Jouflas argues that the "assertion that the network which gives America 'Melrose Place' has a corporate ethic forbidding dissemination of either profane or bawdy speech is beyond disingenuous." He further asserts that if it "were Fox'[s] policy to refrain from all discourse having any element of sexual titillation, the network couldn't air its prime time schedule." We find no merit in this argument. An employer would not allow brewery employees to be drunk on the job or permit pharmaceutical employees to be high on drugs just because these enterprises produce alcohol and stimulants. Likewise, it is ridiculous to argue that the programming of a television station may appropriately be acted out among the production staff. Indeed, if this truly became the practice, there might soon be few television production workers left alive. Jouflas's supervisory authority over Fox's employees gave him a particular responsibility to maintain an appropriate professional working environment and to establish a corporate culture that reflected Fox's antiharassment policies—a responsibility that he ignored.

## CONCLUSION

The record supports the trial court's findings that (1) precontract evidence was properly admitted for purposes of rule 404(b); (2) Jouflas used Fox's assets for his personal benefit and willfully violated Fox's policies regarding air-time trades; (3) any breach of federal equal employment opportunity laws could result in the revocation or nonrenewal of Fox's most important asset, its broadcasting license; (4) Jouflas was aware of Fox's policy prohibiting sexual harassment, yet the sexually explicit conversation which was the norm under his direct leadership was offensive and inappropriate in a work environment; and (5) Jouflas's post-contract treatment of female employees was neither harmless nor innocent in light of his continuing pattern of behavior and his sexually charged relationships with various subordinate female employees.

We affirm the trial court's conclusion that Jouflas's behavior constituted a willful breach of duty sufficient for termination of his employment contract under section 2924 of the California Labor Code and its judgment that he suffered no wrongful discharge.

ZIMMERMAN, C.J., and DURHAM and RUSSON, JJ., concur in Justice HOWE's opinion.

STEWART, Associate C.J., does not participate herein.