STATE of Utah, Plaintiff and Appellee,

v.

Jose Carlos PENA, Defendant and Appellant.

No. 930101.

Supreme Court of Utah.

Feb. 15, 1994.

R. Paul Van Dam, Atty. Gen. and David B. Thompson, Asst. Atty. Gen., Salt Lake City, for plaintiff.

Lisa J. Remal and Ronald S. Fujino, Salt Lake City, for defendant.

ZIMMERMAN, Chief Justice:

Jose Carlos Pena appeals the trial court's denial of several motions to suppress evidence prior to his guilty plea for attempted unlawful possession of a controlled substance, a class A misdemeanor. Utah Code Ann. § 58-37-8(2)(a)(i), (7). Pena raises four claims of error regarding the trial court's evidentiary rulings: (i) The initial stop by police was not supported by reasonable suspicion; (ii) Pena did not voluntarily waive his *Miranda* rights; (iii) the misdemeanor arrest was a pretext for the strip search; and (iv) the strip search that produced the critical evidence was unlawful. This case was certified to this court by the Utah Court of Appeals under rule 43 of the Utah Rules of Appellate Procedure. We affirm.

On April 10, 1991, the Salt Lake City Police Department received a call from a 7-Eleven clerk reporting a theft of prophylactics by a Hispanic male. A description of the suspect and the vehicle in which he was riding, including the license number, was broadcast. Shortly thereafter, Officer Dale Bench sighted the suspect vehicle and pulled it over. The vehicle contained the driver and one passenger. The passenger was later identified as defendant Pena.

A second officer, Officer Buckholts, arrived to assist Officer Bench, and the suspects were then asked to step out of the car. Pena apparently matched the description of the theft suspect. A third officer, Officer Stevens, arrived and recognized Pena as having recently been arrested for a drug offense. Officer Stevens could not remember Pena's name. Pena, who had no identification, told police his name was Marcello Flores. However, on two occasions, he was unable to spell the last name correctly, giving police the spelling M-a-r-c-e-l-l-o F-o-s-e-s.

Pena's inability to spell "Flores" led police to suspect that he was lying about his identity. Officer Buckholts, who knew that the prior drug arrest would be entered on the police computer, requested that a dispatcher search the records for the arrest under the name Marcello Flores. No record was found. The officers then arrested Pena for giving false personal information to an officer, a misdemeanor.[1] *See* Utah Code Ann. § 76-8-507.

While transporting Pena to jail, Officer Buckholts saw Pena "moving around quite a bit in the seat, ... putting his [handcuffed] hands down the back of his pants ..., [and] trying to move them around to the front." These actions led Buckholts to believe that Pena was concealing narcotics. When they arrived at the jail, Buckholts requested that Pena be strip searched. During that search, jail personnel discovered cocaine.

Pena was charged with unlawful possession of a controlled substance, a third degree felony under section 58-37-8(2)(a)(i), and with giving false personal information to a peace officer, a class C misdemeanor under section 76-8-507. Pena moved to suppress statements he made prior to the arrest as well as to suppress the cocaine. He argued that the police violated his rights under the Fourth and Fifth Amendments to the United States Constitution and article 1, sections 12 and 14 of the Utah Constitution. The trial court denied the motions. Pena then entered, and the court accepted, a conditional guilty plea to the lesser offense of attempted unlawful possession of a controlled substance, a class A misdemeanor. The conditional plea preserved Pena's right to appeal the suppression ruling. He appealed to the Utah Court of Appeals, and the matter was argued to a panel of the court. That court certified the case to us before decision, pursuant to rule 43 of the Utah Rules of Appellate Procedure.

We first address the proper standard of review for determinations of reasonable suspicion, which appears to be the reason for the

---

1. Salt Lake City Police Department policy allows officers to issue citations for certain misdemeanors. However, identification or some other means of determining an individual's name and birth date is required before a citation may be issued.

court of appeals' certification of this case.[2] The State argues that we should apply the clearly erroneous standard because reasonable-suspicion determinations are fact intensive and clearly erroneous is the standard that we have suggested is appropriate for fact questions. Pena, on the other hand, argues that the standard of review should be correctness because reasonable suspicion is a legal conclusion. Both parties find support for their contentions in various of our opinions and those of the court of appeals.

We recognize that this court and the court of appeals have created some confusion with regard to standards of review, perhaps in part because this court has not focused much attention on the articulation of those standards until recently, when they assumed an increased level of importance. *See State v. Thurman,* 846 P.2d 1256, 1268–69 (Utah 1993). In *State v. Mendoza,* we reviewed a reasonable-suspicion determination regarding an investigatory stop under a clearly erroneous standard, upholding the trial court's ruling. 748 P.2d 181, 183 (Utah 1987). However, in *State v. Ramirez,* we suggested that all applications of law to findings of fact that produce conclusions of law are reviewed under a nondeferential standard, i.e., for correctness. 817 P.2d 774, 781–82 (Utah 1991). Until recently, the court of appeals tended to follow the language we used in *Mendoza,* concluding that the issue was one of fact, because the deferential standard of review had been used.[3] *See State v. Leonard,* 825 P.2d 664, 667–68 (Utah Ct.App. 1991), *cert. denied,* 843 P.2d 1042 (Utah 1992); *State v. Robinson,* 797 P.2d 431, 435 (Utah Ct.App.1990); *State v. Talbot,* 792 P.2d

489, 493 (Utah Ct.App.1990); *State v. Sery,* 758 P.2d 935, 941–42 (Utah Ct.App.1988). In *State v. Munsen,* however, the court of appeals applied a correction-of-error standard in reviewing a reasonable-suspicion determination. 821 P.2d 13, 14–15 (Utah Ct.App. 1991), *cert. denied,* 843 P.2d 516 (Utah 1992). We endeavored to clarify this matter generally in *Thurman,* but did not specifically address the standard of review for reasonable suspicion in that case. 846 P.2d at 1270 n. 11.

Determination of the proper standard of review requires a brief discussion which we hope will bring some clarity to discussions of the issue. At the most basic level, two different types of questions are presented to a trial court: questions of law and questions of fact. Factual questions are generally regarded as entailing the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind. *See* Ronald R. Hofer, *Standards of Review— Looking Beyond the Labels,* 74 Marq.L.Rev. 231, 236 (1991) [hereinafter Hofer]. Legal determinations, on the other hand, are defined as those which are not of fact but are essentially of rules or principles uniformly applied to persons of similar qualities and status in similar circumstances. *Id.*

Trial courts are given primary responsibility for making determinations of fact. Findings of fact are reviewed by an appellate court under the clearly erroneous standard. For a reviewing court to find clear error, it must decide that the factual

---

**2.** Counsel for both parties tell us that when this case was argued before the court of appeals, the standard of review issue was the subject of much discussion. From that fact and from the fact that the case seems otherwise unexceptional, we assume that the standard of review is the reason for the certification. For that reason, we treat the issue in some depth, although how it is decided may not be outcome determinative.

In the future, it would be of assistance to this court if, when the court of appeals certifies a case to us under rule 43, it would include a statement of reasons so that we can be sure we address the issues it deems important.

**3.** In retrospect, it is not clear whether *Mendoza* meant that the reasonable-suspicion determina-

tion was one of fact, which would clearly be wrong, or whether it meant that this issue is an application of law to fact upon which a trial court should be given some discretion and the "clearly erroneous" language was used to suggest that fact. Such a use of the term "clearly erroneous" to refer to a standard of review for the application of law to fact, although technically incorrect and potentially quite confusing, is not uncommon. *See* Evan Tsen Lee, *Principled Decision Making and the Proper Role of Federal Appellate Courts: The Mixed Questions Conflict,* 64 S.Cal.L.Rev. 235, 236–37 (1991). In any event, the result in *Mendoza* would not have been different if a de novo standard had been applied.

findings made by the trial court are not adequately supported by the record, resolving all disputes in the evidence in a light most favorable to the trial court's determination. *See Wessel v. Erickson Landscaping Co.,* 711 P.2d 250, 252 (Utah 1985); *see also United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). This standard is highly deferential to the trial court because it is before that court that the witnesses and parties appear and the evidence is adduced. The judge of that court is therefore considered to be in the best position to assess the credibility of witnesses and to derive a sense of the proceeding as a whole, something an appellate court cannot hope to garner from a cold record. *In re J. Children,* 664 P.2d 1158, 1161 (Utah 1983).

▉ When it comes to reviewing trial court determinations of law, however, the standard of review is not phrased as "clearly erroneous." Rather, appellate review of a trial court's determination of the law is usually characterized by the term "correctness." Controlling Utah case law teaches that "correctness" means the appellate court decides the matter for itself and does not defer in any degree to the trial judge's determination of law. *State v. Deli,* 861 P.2d 431, 433 (Utah 1993); *see Kennecott Corp. v. State Tax Comm'n,* 858 P.2d 1381, 1383 (Utah 1993). This is because appellate courts have traditionally been seen as having the power and duty to say what the law is and to ensure that it is uniform throughout the jurisdiction. Charles Alan Wright, *The Doubtful Omniscience of Appellate Courts,* 41 Minn.L.Rev. 751, 779 (1957); *see Thurman,* 846 P.2d at 1266. In other words, one can visualize the traditional standard-of-review scheme as a continuum of deference anchored at either end by the clearly erroneous and correction-of-error standards, which correspond with whether the issue is characterized as one of fact or of law.

The parties here have characterized the standard-of-review question before us in terms of this fact/law distinction and argue the issue as though the options were metaphorically black and white—one option being "clearly erroneous" and the other "correct-

ness," with the first requiring very broad deference to the trial court and the second none. It is common for parties to characterize the standard-of-review debate in such a polarized manner. Steven A. Childress, *A Standards of Review Primer: Federal Civil Appeals,* 125 F.R.D. 319, 328 (1989); *see* Evan Tsen Lee, *Principled Decision Making and the Proper Role of Federal Appellate Courts: The Mixed Questions Conflict,* 64 S.Cal.L.Rev. 235, 239–45 (1991). However, we think that these distinctions tend to obscure the real issues. Although the universe of questions presented for review has often been characterized as consisting only of mutually exclusive questions of fact or law, there is really a third category—the application of law to fact or, stated more fully, the determination of whether a given set of facts comes within the reach of a given rule of law. It is *this* determination that is at the heart of the dispute between the parties over the appropriate standard of review for reasonable-suspicion determinations. And it is a dispute with real consequences.

Although implicitly recognizing this fact-to-law category of issues, the parties act as though there are only two possible standards of review—correctness and clearly erroneous. The State would like us to defer to a trial judge's determination that on a particular set of facts reasonable suspicion was present, thus raising a very substantial hurdle to one challenging such a trial court determination. On the other hand, Pena would like the opportunity to convince an appellate court that the trial judge's factual findings do not satisfy the legal standard for reasonable suspicion. He wants us to make this decision without deferring at all to the trial judge on the application of the legal standard to the facts: in other words, to address the matter entirely de novo under a correctness standard.

▉ This third category of determinations raises thorny issues. In the abstract, the effect of a given set of facts is a question of law and, therefore, one on which an appellate court owes no deference to a trial court's determination. In recognition of this fact, the standard of review for such determinations is termed one of "correctness." This is

the message in *Ramirez,* 817 P.2d at 781–82, and in *Thurman,* 846 P.2d at 1270 n. 11, and it contradicts the State's claim that a clearly erroneous standard of review is appropriate here. To this degree, Pena is correct as to the stated standard of review.

Nonetheless, the critical question, and one of some subtlety, arises only after we have said that an issue is a question of law and no deference is owed the trial court. At this point, we must attempt to determine when the articulated legal rule to be applied to a set of facts—a rule that we establish without deference to the trial courts—embodies a de facto grant of discretion which permits the trial court to reach one of several possible conclusions about the legal effect of a particular set of facts without risking reversal. This is really the point of the debate before us. Put in terms of this case, does the legal standard of reasonable suspicion grant any discretion to the trial judge in applying that standard to a set of facts? We think it does. How much? Any answer requires a brief discussion of the discretion that may be given trial judges to determine the application of stated legal principles to facts.

As stated earlier, it is our role as an appellate court to define what the law is, and we never defer to any degree to a trial court on that count. That statement does not, however, tell us much about how closely we should scrutinize the application of a statement of legal principle to a specific set of facts. Yet this is a critical question, for at bottom, what a legal principle means in reality can often be determined only by considering how its general terms are given sharp definition through their application to a series of specific fact situations. *See* Hofer at 234. Determining what the law is actually involves an inductive process as much as a deductive one. The governing legal standard is as often derived by abstraction from specific applications as it is defined in the abstract and then applied to specific situations. Yet while we generally consider de novo a trial court's statement of the legal rule, we often review with far less rigor the court's determination of the legal consequences of facts. The question before us today is whether we can derive any principles to de-termine when such scrutiny should be close and when it should not and what those principles tell us about reviewing a finding of reasonable suspicion.

We find much useful analysis on the rather arcane topic of the degree of discretion to be accorded a trial court's application of legal propositions to facts in an excellent article by Professor Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above,* 22 Syracuse L.Rev. 635 (1971) [hereinafter Rosenberg]. Professor Rosenberg describes the spectrum of discretion that may be granted to a trial judge on questions of law as running from "correctness" to "abuse of discretion." However, we decline to use this terminology because in Utah, we have used the term "correctness" to refer to the concept that an appellate court need not defer to a trial court in the determination of what the law is, including the legal consequences of a particular set of facts, and we think that the term "abuse of discretion" has no tight meaning. *Compare Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 799 (Utah 1991) (applying abuse-of-discretion standard for judgment notwithstanding the verdict) *with State v. Hamilton,* 827 P.2d 232, 239–40 (Utah 1992) (abuse-of-discretion standard for rule 403 rulings). But if the terminology is altered to fit our conceptual framework by labeling the spectrum of discretion in functional terms, running from "de novo" on the one hand to "broad discretion" on the other, Professor Rosenberg's discussion is directly pertinent to the questions before us.

The helpful metaphor Professor Rosenberg uses in describing these degrees of discretion is that of a pasture. To the extent that a trial judge's pasture is small because he or she is fenced in closely by the appellate courts and given little room to roam in applying a stated legal principle to facts, the operative standard of review approximates what can be described as "de novo." That is, the appellate court closely and regularly redetermines the legal effect of specific facts. But to the extent that the pasture is large, the trial judge has considerable freedom in applying a legal principle to the facts, freedom to make decisions which appellate judges might not make themselves ab initio but will

not reverse—in effect, creating the freedom to be wrong without incurring reversal. Only when the trial judge crosses an existing fence or when the appellate court feels comfortable in more closely defining the law by fencing off a part of the pasture previously available does the trial judge's decision exceed the broad discretion granted.

As can be imagined, the real amount of pasture permitted a trial judge will vary depending on the legal issue, although the terminology we use to describe the operative standard of review does not begin to reflect the many shades of this variance. The best we can do is to recognize that such a spectrum of discretion exists and that the closeness of appellate review of the application of law to fact actually runs the entire length of this spectrum.

Our case law provides some examples of legal issues that can be placed at points along this spectrum of discretion, although we have never spoken of what we are doing in quite these terms. At the extreme end of the discretion spectrum would be a decision by the trial court to grant or deny a new trial based on insufficiency of the evidence. *See Hansen v. Stewart,* 761 P.2d 14 (Utah 1988); *see also* Utah R.Civ.P. 50(d). In reviewing this sort of decision, we give the trial court a great deal of pasture. *See Crookston,* 817 P.2d at 799; *Hansen,* 761 P.2d at 17. Also toward the broad end of the spectrum is the decision to admit or exclude evidence under Utah Rule of Evidence 403. *See Hamilton,* 827 P.2d at 239–40. Other rulings on the admission of evidence also generally entail a good deal of discretion. *See, e.g., Russell v. Russell,* 212 Utah 12, 852 P.2d 997, 999 (1993); *State v. Archuleta,* 850 P.2d 1232, 1241 (Utah), *cert. denied,* —— U.S. ——, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993).

On the other hand, there are situations in which we narrow the pasture considerably for policy reasons. One such example involves consent to a search that would otherwise violate the Fourth Amendment. *See Thurman,* 846 P.2d at 1269–71. Finally, at the de novo end of the spectrum are issues such as whether a "municipal function" has been delegated to a state commission in violation of article VI, section 28 of the Utah Constitution. *See Utah Assoc. Mun. Power Sys. v. Public Serv. Comm'n,* 789 P.2d 298, 301–02 (Utah 1990); *City of West Jordan v. State Retirement Bd.,* 767 P.2d 530, 533 (Utah 1988).

Occasionally, we expand or contract the size of the pasture in response to things we learn over time. A recent example is evidenced by our decision in *Soter's, Inc. v. Deseret Federal Savings & Loan Ass'n,* 857 P.2d 935 (Utah 1993). In a series of earlier cases, we had ruled that waiver was or was not present as a matter of law on the specific facts of those cases. This entailed fairly close scrutiny of the application of the general stated waiver principles to particular fact situations. In the course of those decisions, we attempted to incorporate into the statement of the law of waiver those facts that led us to decide each of those cases as we did. *See Hunter v. Hunter,* 669 P.2d 430, 432 (Utah 1983). Over time, we appeared to have developed hopelessly inconsistent elaborations on the basic statement of waiver principles. In *Soter's,* we acknowledged that fact, as well as the futility of attempting such elaborations. 857 P.2d at 939. We then stripped the statement of the law back to its most basic form and told the trial courts to apply it. *Id.* at 942. The net effect was to say that waiver is a highly fact-dependent question, one that we cannot profitably review de novo in every case because we cannot hope to work out a coherent statement of the law through a course of such decisions. In terms of our present discussion, *Soter's* increased the size of the trial court's pasture because we found ourselves unable to describe the shape of the smaller one with adequate clarity.

All the foregoing helps in understanding the reality that underlies the rather wooden characterization of standards of review which we often use when discussing the application of law to facts. And that reality suggests criteria for determining when some degree of deference may be given a trial court's application of a particular principle of law to specific facts. A number of reasons usually given for granting trial judges discretion on legal questions are canvassed by Professor Rosenberg. He finds three reasons that are

useful in discerning when some degree of discretion ought to be left to a trial court: (i) when the facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out; (ii) when the situation to which the legal principle is to be applied is sufficiently new to the courts that appellate judges are unable to anticipate and articulate definitively what factors should be outcome determinative; and (iii) when the trial judge has observed "facts," such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts. Rosenberg at 662–63.

Of course, there are countervailing policy reasons for not granting broad discretion to a trial court. For example, in *Thurman,* we found that while there were varying fact patterns that would be relevant to determinations of voluntariness of consent, they were not so unmanageable in their variety as to outweigh the interest in having uniform legal rules regarding consent to search, given the substantial Fourth Amendment interests lost as a result of such consents. *Thurman,* 846 P.2d at 1271.

 With these considerations in mind, we move on to the question of the standard of review appropriate to reasonable-suspicion determinations. We conclude that the proper standard of review to be applied to a trial court determination of whether a specific set of facts gives rise to reasonable suspicion is a determination of law and is reviewable nondeferentially for correctness, as opposed to being a fact determination reviewable for clear error.[4] We further conclude that the reasonable-suspicion legal standard is one that conveys a measure of discretion to the trial judge when applying that standard to a given set of facts. Precisely how much discretion we cannot say, but we would not anticipate a close, de novo review. On the other hand, a sufficiently careful review is necessary to assure that the purposes of the reasonable-suspicion requirement are served.[5]

4. We reiterate that "[w]e review the factual findings underlying the trial court's decision to grant or deny a motion to suppress evidence using a clearly erroneous standard." *State v. Brown,* 853 P.2d 851, 855 (Utah 1992). It is not within the appellate court's authority to review de novo the factual underpinnings of a motion to suppress.

Some may take issue with the our decision not to use the term "clearly erroneous" in the context of reasonable-suspicion determinations, because that term is already in common usage. The change is necessary, however, in light of our new analytical perspective. As noted before, we use the term "clearly erroneous" to describe the standard by which we review purely factual determinations. This standard represents a fixed allocation of power and responsibility between the trial and appellate courts that is grounded in our distinct and unchanging institutional competencies regarding questions of fact. Because there is no inherent policy component in fact determinations, it will never be appropriate for an appellate court to overturn a trial court's factual determinations when they have substantial record support. Given this grounding, we decline to utilize the term "clearly erroneous" to describe the standard used to review determinations that are not forever beyond the power or responsibility of the appellate court to substitute its judgment, but have only been placed temporarily beyond the reach of de novo review as a matter of appellate court forbearance for institutional policy reasons. We think that clarity of thought is promoted by using a different term to convey that reasonable suspicion is ultimately a legal question, and thus the appellate court does have the ultimate authority to define, as it deems appropriate, the contours of the disputed term.

Admittedly, this lexical change may engender some confusion in the short term as appellate judges and counsel become accustomed to it. In the long run, however, it should prevent the development of two somewhat divergent and likely confused lines of precedent, both purporting to apply to the same standard of review. If we failed to make this change, "clearly erroneous" would refer to situations in which the trial court has fixed discretion and the appellate court has a permanently limited role—the review of factual determinations—and would also refer to situations in which the trial court's discretion is a matter of appellate court grace and the appellate court's role is reviewable over time and circumstances—the application of fact to law. We believe it is better to change terms now than to attempt to construct and maintain two different legal edifices, both of which rest upon the same phrase.

5. Returning to our earlier metaphor, the appellate court reviews for correctness the placement of the legal fences which delimit the pasture of trial court discretion to determine what constitutes reasonable suspicion. The decision when to create and where to place these fences is an issue of law, and no deference is accorded to the trial court. Not every case that reaches an ap-

Our decision to characterize the review as something less than de novo [6] is largely due to the first factor spelled out by Professor Rosenberg: Reasonable-suspicion determinations are highly fact dependent, and the fact patterns are quite variable.[7] It would be impractical for an appellate court to review every reasonable-suspicion determination de novo and then pronounce whether each unique factual setting rises to the level of reasonable suspicion as a matter of law. If we were to try, it is likely that the resulting case law would be confusing and inconsistent. Our recent experience with the law of waiver, discussed in *Soter's*, shows that this concern is not fanciful. On the other hand, we are not precluding this court or the court of appeals from effectively fencing off parts of the discretionary pasture from trial judges once the reviewing courts have enough experience with certain recurring fact patterns that the legal effect of those patterns can be settled with comfort. However, except in those situations in which appellate courts feel comfortable in developing the law in such a manner, trial courts should be permitted some rein to grapple with the multitude of fact patterns that may constitute a reasonable-suspicion determination. *See* Childress, 125 F.R.D. at 338.

■ With this concept of reasonable suspicion in mind, we now address Pena's claims. Pena first argues that the trial court erred in finding that the stop by police was supported by reasonable suspicion. He claims that the police did not have reasonable suspicion because they had not interviewed the 7–Eleven clerk beforehand to assure that a crime had taken place. In response, the State maintains that the dispatched report was sufficient for the stop.

The United States Supreme Court has held that an officer may stop and question a person "when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place*, 462 U.S. 696, 702–03, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). In determining whether such reasonable suspicion exists, we have indicated that under certain circumstances, police officers can rely on a dispatched report in making an investigatory stop. *State v. Bruce*, 779 P.2d 646, 650–51 (Utah 1989). Here, we think that the dispatcher gave Officer Bench sufficient information for him to form a reasonable suspicion that Pena or the driver had committed a crime, justifying the stop of the car in which Pena was a passenger. We cannot agree that Officer Bench was required to allow a suspect who matched the detailed description given by the store clerk to continue until another officer had the opportunity to go to the 7–Eleven store and interview the clerk. We therefore conclude that the trial court did not err in finding that the dispatched report contained articulable facts to support a finding of reasonable suspicion.

■ Second, Pena argues that when the police finally read the *Miranda* warnings to him, he did not effectively waive his rights because he did not fully understand English. A waiver of *Miranda* rights may be inferred from a defendant's "actions and words," *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979), and is based on the "totality of the circum-

---

pellate court, however, must result in the establishment of a fence. Until the appellate court has fenced off a particular area of the pasture—that is, determined that a particular fact situation does or does not create reasonable suspicion as a matter of law—the trial court has discretion to venture into that area—in other words, to determine whether a given set of facts satisfies the legal standard of reasonable suspicion.

6. We recognize that this "some discretion" standard is less than precise, but so are many legal standards. It is difficult to describe more exactly without the benefit of concrete factual scenarios. We anticipate that developing case law will further illuminate the appropriate level of review.

7. The multitude of variable fact patterns is easily demonstrated. *See State v. Ramirez*, 817 P.2d 774, 787–88 (Utah 1991) (no reasonable suspicion when a man seen walking near defendant ran away); *State v. Carpena* 714 P.2d 674, 675 (Utah 1986) (vehicle moving at slow speed in previously burglarized neighborhood at 3 a.m. did not provide articulable facts on which to formulate reasonable suspicion); *State v. Munsen*, 821 P.2d 13, 16 (Utah Ct.App.1991) (woman's vague and suspicious responses did not provide basis to suspect that she had committed or was about to commit crime).

stances." *State v. Strain,* 779 P.2d 221, 224 (Utah 1989) (citing *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)). We review the trial court's legal conclusion of a valid waiver for correctness. *State v. Sampson,* 808 P.2d 1100, 1111 (Utah Ct.App.1990), *cert. denied,* 817 P.2d 327 (Utah 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992). However, this standard of review grants a measure of discretion to the trial court because of the variability of the factual settings. *See, e.g., State v. Bishop,* 753 P.2d 439, 466–67 (Utah 1988). Here, the trial court found that Pena had no problem understanding English. Based on that factual determination, we find no error in the conclusion that Pena validly waived his rights.[8]

■ Pena next claims that his arrest for giving false information to a police officer was a pretext for the strip search and consequently was illegal. This contention is based on the assumption that the arrest was improper. Because we find that the officers had probable cause to arrest Pena, we do not consider his pretext argument. *Archuleta,* 850 P.2d at 1237–38.

■ Finally, Pena claims that the strip search at the jail was unnecessary and intrusive and violated his Fourth Amendment rights. Specifically, he argues that the misdemeanor arrest could not give rise to a valid concern that he was carrying contraband or weapons into the jail facility and, therefore, the strip search was unjustified.

In response, the State argues that under federal law, strip searches are justifiable under circumstances amounting to less than probable cause when the need to prevent introduction of narcotics or contraband into a holding cell outweighs the invasion of personal rights. In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the United States Supreme Court considered the consti-

tutionality of strip searches following an arrest. The Court stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. at 1884.

In this case, the trial court found that the strip search was supported by a reasonable suspicion that Pena was carrying drugs. Officer Buckholts knew that Pena had been arrested for a drug offense, and he had observed Pena with his handcuffed hands in the back of his pants as though attempting to conceal something. On that factual basis, we cannot say that the trial court erred in concluding that a strip search was justified.

■ We have considered Pena's other arguments and find them to be without merit.[9] We affirm the trial court's denial of Pena's motions to suppress.

STEWART, Associate C.J., and HALL and DURHAM, JJ., concur.

HOWE, J., concurs in the result.

HALL, J., acted on this case prior to his retirement.

---

8. Pena also argues that once the vehicle was stopped and he was asked to exit the car, he was in custody or was "arrested" and therefore the police were required to read him the *Miranda* warnings before ever asking his name. Because the argument was not raised below, we do not consider it.

9. Pena also argues that the officers "exceeded the permissible scope of the interference," but he is precluded from making this argument because he did not raise it at the suppression hearing. *State v. Carter,* 707 P.2d 656, 660 (Utah 1985) ("[W]here a defendant fails to assert a particular ground for suppressing unlawfully obtained evidence in the trial court, an appellate court will not consider that ground on appeal.").