**STATE of Utah, Plaintiff and Appellee,**

v.

**Anthony M. GORDON, Defendant and Appellant.**

**No. 940345–CA.**

Court of Appeals of Utah.

Dec. 1, 1994.

Martin V. Gravis, Ogden, for defendant and appellant.

Jan Graham and Kris C. Leonard, Salt Lake City, for plaintiff and appellee.

Before DAVIS, GREENWOOD and ORME, JJ.

*OPINION*

GREENWOOD, Judge:

Defendant Anthony M. Gordon challenges his conviction of aggravated burglary, a first-degree felony, in violation of Utah Code Ann. § 76–6–203 (1990); and aggravated kidnap-

ping, a first-degree felony, in violation of Utah Code Ann. § 76–5–302 (1990). Defendant claims that the introduction of false testimony by prosecution witnesses requires reversal. We affirm.

## BACKGROUND

On September 12, 1993, Leonard Kellywood was at his Ogden apartment, awaiting the return of Roberta Ness, his fiancee, and their twenty-two-month-old child, both of whom had attended a wedding in New Mexico.

A little after 9 p.m., Kellywood heard the doorbell ring. Before opening the door, Kellywood looked through the peephole and observed a man wearing a dark blue pullover sweatshirt with the hood over his head. Kellywood testified that he recognized the man standing outside the door as defendant, although he knew him only by his nickname "Two Fly." [1] Kellywood testified that he knew defendant as a frequent guest at numerous parties held in apartment K–9, which was directly below Kellywood's apartment.

When Kellywood opened the door, the man, who now had a bandanna over his face, pushed the door open, placed a gun to Kellywood's head and ordered him down on the ground. Kellywood testified that because he had recognized the man as Two Fly, he at first believed the confrontation was a prank. However, when the man repeated the command, Kellywood complied.

The man bound and blindfolded Kellywood, then began rummaging through the apartment. During that time, Kellywood secretly freed one of his arms, then managed to remove his blindfold and free his legs. With the blindfold removed, Kellywood got a good look at his assailant, who was no longer wearing the bandanna over his face, and once again recognized him as Two Fly. He testified that the two of them scuffled briefly before the intruder fled.

When police arrived, they found a blue and white bandanna, which Kellywood told officers was worn by the assailant. Two of the investigating officers later testified that the bandanna was similar to one defendant was wearing when they observed him earlier in the evening at an Ogden park.

The following morning, Kellywood identified a photo of defendant as the man who had broken into his apartment. The next day, Kellywood went to his landlord's house to pay rent and saw defendant outside the house. The landlord phoned police, who arrested defendant.

At trial, the State called Kellywood and Ness to testify. As the State's first witness, Kellywood recounted the incident and also testified that he had seen defendant frequently at apartment K–9 between mid-August and September 12 of 1993. He testified that he had spoken directly with defendant on two occasions in mid-August, once when Kellywood was working on a motorcycle, and again two days later when he was walking past apartment K–9.

After Kellywood's testimony, defense counsel requested a conference in chambers. Defense counsel informed the court that Kellywood could not have seen defendant at apartment K–9 during mid-to-late August because defendant was incarcerated at MOWEDA, a youth detention facility, from August 11 to September 3rd. Defense counsel argued that the prosecution was required by law to correct the record and asked the prosecution to stipulate that Kellywood was wrong when he testified that he had seen defendant at the apartment complex between mid-August and September 12. The prosecutor declined. However, he re-examined Kellywood, who acknowledged that he may have seen defendant at parties during the early part of August and that his conversations with defendant took place during the first week of September, after September 3rd. During cross-examination, defense counsel also emphasized Kellywood's mistaken testimony.[2]

1. Kellywood later learned that Gordon's nickname is actually "Teafly."

2. In fact, defense counsel prefaced one question with the statement that "there is certain evidence that [the prosecutor] is aware of now which indicated that [Kellywood] could not have seen [defendant] from mid-August until after the 1st of September."

Next, the prosecutor called Ness and questioned her about defendant's presence at the apartment complex. Although Ness referred to several occasions when she saw defendant, she did not tie those occasions to specific dates. However, during cross-examination, defense counsel asked for specific dates, and Ness responded that she had seen defendant during the third or fourth week in August. Ness reiterated this statement the following day during further cross-examination.

Following Ness's testimony, defense counsel again requested that the prosecutor be required to correct the record. The trial court declined to require the clarification, stating that the question of whether the witnesses remembered correctly went to their credibility.

At the conclusion of the State's case, defendant moved for a mistrial, claiming that the State's refusal to correct the "false or misleading" testimony violated defendant's due process rights under the United States and Utah Constitutions. The trial court denied the motion. Defense counsel later introduced the testimonies of defendant and Patrick Lambert, director of MOWEDA, who both testified that defendant was incarcerated from August 11 to September 3.[3]

The jury convicted defendant on both counts. He was sentenced to fifteen years in prison on the burglary count, one-to-five years in prison on the kidnapping count, and was ordered to pay $275 in restitution to the victim.

## ISSUE ON APPEAL

The sole issue on appeal is whether the prosecutor's failure to correct erroneous testimony by two prosecution witnesses resulted in a violation of defendant's due process rights.

## STANDARD OF REVIEW

■ Trial courts are generally accorded some degree of discretion in applying a legal standard to a given set of facts. *State v. Pena*, 869 P.2d 932, 937 (Utah 1994). Such "discretion" allows the trial court "to reach one of several possible conclusions about the legal effect of a particular set of facts without risking reversal." *Id.* The *Pena* court likened the degree of discretion accorded a trial court to a "pasture," the boundaries of which are determined by "fences" erected by appellate courts. *Id.* The trial court's pasture may be narrowly fenced when there is little discretion or more expansive when there is broad discretion. *Id.* at 937–38.

■ The precise standard of review for a trial court's decisions regarding false or misleading testimony has not yet been articulated under *Pena*'s pasture analogy. However, it is consistent with similar types of decision-making to accord trial courts relatively wide discretion in this area. *See* Norman H. Jackson, *Utah Standards of Appellate Review*, Utah Bar Journal, October 1994, at 9, 21 (examples of broad discretion include a trial court's decisions on motions for new trial or mistrial, disqualification of prosecutor, and excluding victim during trial). We therefore accord the trial court in this case considerable discretion in its decision regarding the legal effect of the incorrect testimony on defendant's trial.

## ANALYSIS

Defendant argues that the prosecutor's failure to correct the false testimony[4] of Kellywood and Ness concerning the period of time they saw defendant at the apartment complex violated defendant's due process rights. Defendant further claims he was forced to introduce the prejudicial MOWEDA evidence in order to rebut the false testimony.

■ As the State's representative, the prosecutor has a duty to " 'see that justice is done.' " *Walker v. State*, 624 P.2d 687, 691 (Utah 1981) (citation omitted). A conviction

---

3. The court apparently gave the jury a cautionary instruction concerning the MOWEDA incident. That instruction was not included in the record on appeal, but was referred to in the record.

4. The State does not really dispute the claim that the testimony was false, although it prefers to characterize the inaccuracies as "an honest mistake in memory" and an "inexact approximation."

obtained through false testimony "must fall under the due process clause of the Fourteenth Amendment and Article I, Section 7, of the Utah State Constitution." *Id.* at 690; *see Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). Therefore, when a prosecutor is aware that testimony is false, he or she has a duty to correct the false impression; failure to do so requires reversal "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Walker,* 624 P.2d at 690;[5] *State v. Schreuder,* 726 P.2d 1215, 1228 (Utah 1986); *State v. Shabata,* 678 P.2d 785, 789 (Utah 1984); *see Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). This applies even if the prosecutor unwittingly introduced the false testimony, as appears to have happened in the instant case. *Napue,* 360 U.S. at 269, 79 S.Ct. at 1177; *Shabata,* 678 P.2d at 789; *Walker,* 624 P.2d at 690.

In this case, the State clearly made some effort to correct the record after defense counsel informed the prosecutor and the trial court of defendant's MOWEDA incarceration. On redirect, Kellywood admitted that he may have been wrong in his earlier testimony about the dates he had seen defendant.[6] Further, during cross-examination, Kellywood repeatedly acknowledged that his original testimony was in error.[7]

Additionally, when examining Ness, the prosecutor avoided questioning her about the dates she had observed defendant at the apartment. It was defense counsel who elicited testimony from Ness that she had seen defendant at the apartments during the third or fourth week in August.[8]

■ Although it might be argued that the prosecutor could have done more to correct the false testimony, the record indicates that, well before the MOWEDA evidence was presented, the prosecution and defense effectively removed any lingering misapprehension by the jury about whether the witnesses could have seen defendant at the apartments between August 11 and September 3. Thus, the trial court did not abuse its discretion by implicitly ruling that the inaccurate testimony had been sufficiently clarified.[9]

■ Moreover, even if some jurors continued to believe Kellywood and Ness had seen defendant during mid-to-late August, this misapprehension would not have materially affected the outcome of the trial. As the State argues, there was extensive independent evidence concerning defendant's presence at the apartment complex. Kellywood testified that he saw defendant at the apartments about twenty times. Defendant himself admitted attending parties or "hanging

---

5. Some of the trial court's remarks suggest that the State is only required to correct the record if the witnesses committed perjury. But *Walker* makes it clear that the State is required to correct any false testimony once the state learns of it, even if the false testimony was given in good faith. *Walker v. State,* 624 P.2d 687, 690 (Utah 1981).

6. The prosecutor's efforts were especially important with regard to Kellywood, whose ability to identify defendant as the perpetrator was crucial to the State's case. Conversely, Ness's testimony, although significant to the extent that it corroborated Kellywood's claim to have seen defendant frequently at the apartment complex, has no bearing on the identification of defendant as the perpetrator of the crime in question.

7. For example, defense counsel engaged in the following colloquy with Kellywood:

    Q. Now, during the break you had a conversation with Mr. Parmley [the prosecutor], correct?
    A. Yes.

    Q. And he told you that there is certain evidence that he is aware of now which indicates that you could not have seen Anthony Gordon from mid-August until after the [first] of September, that we can prove you could not have seen him[,] is that correct?
    A. Yes.

8. This enabled defendant to impeach Ness's testimony when it was revealed that defendant was not present during that period. Thus, Ness's testimony was not prejudicial; in fact, her testimony, in light of the subsequent revelation concerning defendant's whereabouts at the time, actually bolstered defendant's case.

9. The trial court also found that inaccuracy in the testimony of either witness "goes to credibility." This does not, of course, mean that the jury is free to believe that Kellywood and Ness saw defendant at the Camden Apartments during the period of time he was incarcerated at MOWEDA. Rather, it means that the inaccurate statements may be considered by jurors when weighing the overall credibility of the witnesses.

out" at apartment K–9 virtually every day after his release from MOWEDA. He also verified Kellywood's claim that the two had met on at least two occasions. Defendant disputed only the claim that he was at the apartments between August 11 to September 3. The essence of Kellywood's testimony remained the same—he had seen defendant frequently enough to recognize him as the man who forced his way into the apartment on September 12.

Thus, we conclude there was no reasonable likelihood of prejudice to defendant as a result of the erroneous testimony. Accordingly, it was not necessary to introduce evidence concerning defendant's stay at MOWEDA.[10] Finally, if the introduction of the MOWEDA evidence was itself error, it constitutes invited error for which defendant is not entitled to relief on appeal. *State v. Dunn,* 850 P.2d 1201, 1220 (Utah 1993).

## CONCLUSION

 Although portions of the testimony of two key witnesses was erroneous, the efforts of the prosecutor and defense attorney successfully dispelled most if·not all of the confusion the inaccurate testimony may have created in the minds of jurors. Thus, the prosecutor was not required to stipulate that the testimony was false. Moreover, even if there were jurors who continued to believe Kellywood and Ness saw defendant at the apartment in mid-to-late August, such an erroneous impression was harmless in light of other evidence that Kellywood could reliably identify defendant. Because the impact of the evidence was harmless, it was not necessary for defendant to introduce evi-

dence concerning his MOWEDA incarceration. Furthermore, introduction of such evidence constitutes invited error. Thus, we affirm the conviction.

DAVIS, J., concurs.

ORME, J., concurs in result.

---

10. Defendant cites Rule 609(a) of the Utah Rules of Evidence in support of his claim that he was forced to use the MOWEDA evidence to impeach the testimony of Kellywood and Ness. But Rule 609(a) addresses the question of whether evidence of prior crimes may be admitted against a witness for impeachment purposes. The rule does not encompass the situation here where a defense attorney introduces otherwise inadmissible testimony on behalf of his client. Similarly, defendant's reliance on *State v. Saunders,* 699 P.2d 738 (Utah 1985), is also inapposite. In *Saunders,* a defendant was convicted of burglary, theft and possession of a firearm by a restricted person. The Utah Supreme Court ruled that the counts should have been severed because evi-

dence of the defendant's incarceration, although relevant to prove the charge of possession of a firearm by a restricted person, was inadmissible prior crimes evidence as to the burglary and theft counts. *Id.* at 741–42. Thus, use of the incarceration evidence violated the old Rule 55 of the Utah Rules of Evidence (since replaced by Utah R.Evid. 404), which prohibited the use of prior crimes or civil wrongs to prove a disposition to commit another specific crime. *Id.* *Saunders* stands for the proposition that such evidence cannot be admitted over a defendant's objections. It does not prohibit a defendant from introducing such evidence for his or her own purposes.