1999 UT 51

**STATE of Utah, Plaintiff and Appellee,**

v.

**Richard M. CARDALL, Defendant and Appellant.**

**No. 970433.**

Supreme Court of Utah.

May 21, 1999.

 
 
 
 
 
 
 

 
 
 
 
 
 

 
 
 
 
 
 
 
 

 
 
 
 
 
 
 
 
 
 

 
 
 

 
 
 
 

Jan Graham, Atty. Gen., Thomas B. Brunker, Asst. Atty. Gen., Salt Lake City, Mark R. Decaria, Ogden, for plaintiff.

Jay D. Edmonds, Salt Lake City, for defendant.

HOWE, Chief Justice:

## INTRODUCTION

¶ 1 Defendant Richard M. Cardall was charged with rape of a child, a first degree felony. A jury found him guilty as charged, and the trial court sentenced him to a prison term of six years to life. He now appeals his conviction.

## FACTS

¶ 2 In the early afternoon of July 8, 1994, S.F. and J.F., eleven-year-old twin sisters, returned home after a softball game. They were met by their summer babysitter, who normally stayed at the twins' home from 7:30 a.m. to 5 p.m. while their mother worked. Shortly after the twins returned home, their mother's boyfriend, Richard Cardall, came to the house and told the babysitter that she could leave, and he would watch the twins until their mother returned home from work. This was the first time that Cardall had ever relieved the sitter.

¶ 3 After the sitter left, Cardall took J.F. over to a friend's house for a slumber party that both J.F. and S.F. were planning to attend. He would not allow S.F. to go to the friend's house because he told her that she had to stay to do chores. S.F.'s mother had never given Cardall permission to assign chores to either of her daughters.

¶ 4 According to S.F., when Cardall returned from dropping J.F. off at the friend's house, he went straight into the kitchen, opened a drawer, and took out a dishcloth. He then walked into the living room, where S.F. was watching television, and told her to turn off the TV and go upstairs. Once upstairs, Cardall told S.F. to go into her bedroom. He then put the dishtowel in her mouth, securing it with a rubber band, and raped her on her bed. After raping S.F., Cardall said, "[I]f you ever tell anybody, I will hurt your mom and sister."

¶ 5 After the date of the alleged rape, S.F.'s family noticed distinct and drastic changes in her behavior. She became distant, alienating herself from friends and no longer participating in outdoor activities. She seemed to have decreased self-esteem, a nervousness and fear of men, and recurring nightmares that she was being raped. Most notably, S.F. never again slept in her own bed.

¶ 6 On several occasions, S.F.'s mother asked S.F. what her dreams were about. When she said her nightmares were about Cardall raping her, S.F.'s mother asked her if she had actually been raped. In response to this question, S.F. became "very anxious and nervous" and said, "[N]o, no, they are just nightmares. It is just a nightmare. I just see it over and over in my mind."

¶ 7 Three weeks after the alleged rape, Cardall and S.F.'s mother stopped dating. Cardall instigated the break-up after S.F.'s mother refused to allow Cardall to have any voice in disciplining S.F. Sometime following the break-up, Cardall met with his ex-wife to discuss some business matters. At some point, the conversation turned to Cardall's relationship with J.F., S.F., and their mother. Cardall told his ex-wife that he "thought the world" of J.F., but that S.F. "would be the type that would accuse him of molesting her."

¶ 8 In April 1995, S.F. began refusing to go to school. On May 4, 1995, she was taken to school by her father, but upon entering the school she was "extremely upset and crying out of control." To help determine what was wrong with S.F., a school counselor gave her an "anxiety exam." On another occasion, S.F. told her mother that she would not go to school because she was scared of a school janitor who had cornered her in the cafeteria and tried to undo her pants. Eventually, S.F. threatened to hurt herself if she was forced to go to school. At the suggestion of a school counselor, S.F. was taken to Charter Canyon Hospital for mental health treatment. The counselor believed that putting S.F. in Charter Canyon might "be a way to get to the root of what was really bothering [S.F.]."

¶ 9 S.F. stayed at Charter Canyon for a week, returning home on May 18, 1995. That evening, S.F.'s mother told her that she needed to try to sleep in her own bed, but S.F. said that she could not. When asked why, S.F. said that at Charter Canyon "she learned that she needed to tell the truth regardless of how much it hurt and how painful it was in order for her to get better." She then told her mother that Cardall had raped her. The next morning, S.F.'s mother reported the rape to the police.

¶ 10 Cardall was subsequently charged with rape of a child, a first degree felony pursuant to Utah Code Ann. § 76-5-402.1. Prior to trial, he moved the court to conduct an in camera review of S.F.'s school psychological records. Specifically, Cardall wanted to review the "anxiety exam" that was administered by S.F.'s school counselor and any information regarding the incident with the school janitor. The trial court refused to allow a review of the school records on the basis of privilege.

¶ 11 A jury subsequently convicted Cardall as charged. He now appeals from his conviction, contending that (1) the trial court committed reversible error by denying two motions for mistrial; and (2) the trial court denied his rights to due process by refusing an in camera review of S.F.'s school psychological records.

## ANALYSIS

### I. MOTIONS FOR MISTRIAL

¶ 12 Cardall's first claim of error is that the trial court failed to grant his motion for a mistrial following an incident between S.F. and her mother on the witness stand (the "witness stand incident"). At trial, S.F. testified that Cardall raped her. Near the conclusion of her testimony, she became visibly upset, and the trial judge called for a recess to allow S.F. to regain her composure. The judge left the courtroom almost immediately. However, with S.F. still on the witness stand and the jury still in the jury box, S.F.'s mother entered the courtroom and proceeded to embrace, comfort, and console her. The contact between S.F. and her mother was a quiet exchange of affection, and there was no discussion regarding the substance of S.F.'s testimony or the case against Cardall.

¶ 13 Following the witness stand incident, Cardall moved for a mistrial, arguing that because the incident occurred in the presence of the jury, it violated the court's exclusionary rule and bolstered S.F.'s credibility with the jury. In response to Cardall's motion, the court, the prosecution, and the defense questioned S.F.'s mother regarding the incident. At the conclusion of the questioning, the court denied Cardall's motion, stating:

[S.F.'s mother], from everything I can gather and tell, did provide the comfort. Yes, it did happen in front of the jury, which I think is unfortunate. I do not view it quite as far as the defense goes in the fact that it bolsters or gives [S.F.'s] testimony any credibility. I think any jury

would expect a mother or father to be supportive of their child.

The court further stated that the incident did not rise to the level requiring a mistrial and that any influence the incident might have had on the jury could be remedied by curative jury instructions.

¶ 14 Cardall's second claim of error is that the trial court failed to grant his motion for a mistrial following a conversation which allegedly took place between S.F. and one of the officers who investigated the case (the "jury room incident"). Immediately after the witness stand incident, S.F. was taken out of the courtroom by the officer. He took her to a jury room, where the two of them remained for the duration of the recess. Cardall's brother-in-law, who was sitting at the back of the gallery during the trial, claimed to have been sitting close enough to the jury room to overhear a conversation between S.F. and the officer. The brother-in-law testified that the officer told S.F. that the testimony she had just given on the witness stand varied from some of her earlier testimony.

¶ 15 In response to this complaint, the court, the prosecution, and defense counsel examined Cardall's brother-in-law, the police officer, and S.F. When questioned by the judge, both S.F. and the officer independently testified that the officer had told S.F. only that she was doing fine, and there was no other discussion of nor reference made to the trial or S.F.'s testimony.[1]

¶ 16 Despite the testimony of the officer and S.F., Cardall again moved for a mistrial, arguing that the alleged jury room incident, if viewed in conjunction with the witness stand incident, warranted a mistrial. The trial court denied the motion, stating that there was nothing that indicated that S.F.'s testimony was "enhanced, changed, slightly adjusted" when she returned to the witness stand after the recess and that the alleged jury room incident did not rise to the level necessitating a mistrial.

¶ 17 Cardall contends that the trial court abused its discretion by not granting his

motions for mistrial, thereby denying his right to a trial by a fair and an impartial jury. Specifically, Cardall argues that (1) the witness stand incident was an impermissible jury contact which created a rebuttable presumption of prejudice; (2) the witness stand incident deprived him of his right to trial free from demonstration and emotional outburst; (3) the witness stand incident improperly and prejudicially bolstered S.F.'s credibility in front of the jury; and (4) the cumulative effect of the witness stand incident and the alleged jury room incident combined to deny him a fair trial.

### A. Standard of Review

¶ 18 It is the trial court's responsibility to determine if an incident rises to the level requiring a mistrial, and it is the trial court which must decide if an " 'incident *may have* or *probably* influenced the jury, to the prejudice of [the defendant].' " *State v. Robertson*, 932 P.2d 1219, 1230 (Utah 1997) (quoting *Burton v. Zions Coop. Mercantile Inst.*, 122 Utah 360, 249 P.2d 514, 517 (1952)). If the court concludes that the jury was probably not prejudiced by an incident, motion for a mistrial should be denied. *See id.* at 1231.

¶ 19 "We will not reverse a trial court's denial of a motion for mistrial absent an abuse of discretion." *Robertson*, 932 P.2d at 1230 (citing *State v. Thomas*, 830 P.2d 243, 245 (Utah 1992)). Once the trial court has ruled on the motion, "the prerogative of this court on review is much more limited," and "[u]nless a review of the record shows … that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion." *Robertson*, 932 P.2d at 1231 (citing *Burton*, 249 P.2d at 517).

¶ 20 Moreover, "[w]e review such a decision with just deference because of the advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings." *Id.;*

---

1. Both S.F. and the officer testified that they discussed the pigeons that were just outside the window.

*see also State v. Pena,* 869 P.2d 932, 935–36 (Utah 1994).

## B. Impermissible Jury Contact

¶ 21 Cardall asserts that the witness stand incident constituted impermissible jury contact which created a presumption of prejudice. To support his assertion, he relies on *State v. Pike,* 712 P.2d 277 (Utah 1985), and *State v. Erickson,* 749 P.2d 620, 621 (Utah 1987). However, Cardall incorrectly applies the law of these cases to the case at hand. In both *Pike* and *Erickson,* we reversed convictions after key state witnesses engaged in unauthorized direct conversation with jurors. The rule established in those cases "is that improper juror contact with witnesses or parties raises a rebuttable presumption of prejudice." *Pike,* 712 P.2d at 280. No presumption of prejudice arises, however, in the present case. Here there was no conversation between witnesses and jurors, just a quiet exchange between S.F. and her mother.

¶ 22 Cardall has failed to produce any evidence which would raise a presumption of prejudice which the State must rebut. He has also failed to cite any Utah case which holds that incidents like the witness stand incident invoke a presumption of prejudice. We therefore conclude that the trial court did not err by failing to find prejudice. Cardall further argues that the witness stand incident was a "demonstration" or an "emotional outburst" which denied him his rights to a fair and an impartial jury. To support this assertion, Cardall cites a host of cases from other jurisdictions where an "extraordinary variety of irregularities has been held to require a new trial." These irregularities include demonstrations and emotional outbursts such as laughter, hostile and impassioned epithets, witness hysteria, loud weeping during closing statements, witness kneeling and praying for guidance, and a rape victim yelling at the defendant. *See State v. Gevrez,* 61 Ariz. 296, 148 P.2d 829 (1944) (weeping mother of victim seated near jury cried out, "Stop it! She's dead!"); *Rodriguez v. State,* 433 So.2d 1273 (Fla.Dist.Ct. App.1983) (hostile, impassioned epithets of victim's widow) *Wamsley v. State,* 171 Neb. 197, 106 N.W.2d 22 (1960) (rape victim's hysteria on witness stand and during recess; father of victim standing up during his daughter's examination and yelling "That's enough!" and then going to the witness stand to assist his daughter down); *State v. Stewart,* 278 S.C. 296, 295 S.E.2d 627 (1982) (crowded, noisy courtroom, outbursts of laughter, spectator glaring toward jury); *State v. Baker,* 48 S.D. 636, 205 N.W. 666 (1925) (rape victim holding up a baby and yelling to defendant, "Here's your sonny"); *Cooper v. State,* 72 Tex.Crim. 645, 163 S.W. 424 (1914) (witness kneeling and praying to be guided while giving her testimony).

¶ 23 Giving full effect to the cases cited by Cardall, the witness stand incident does not reach the level of a demonstration or an emotional outburst. On the contrary, the incident which took place between S.F. and her mother was a very private and quiet exchange of affection.

¶ 24 Cardall charges that the witness stand incident improperly and prejudicially bolstered S.F.'s credibility with the jury. The trial court found no evidence to support this claim, and Cardall has not demonstrated on appeal that the court abused its discretion. We therefore conclude that S.F.'s testimony was not bolstered or otherwise made more credible after the witness stand incident.

## C. Cumulative Error

¶ 25 Cardall finally asserts that the cumulative effect of the witness stand incident and the alleged jury room incident prevented Cardall from receiving a fair trial. This assertion lacks merit. These incidents did not independently warrant a mistrial. The record shows that the trial court carefully considered each incident, and in response to both of Cardall's motions for mistrial, the trial court, the prosecution, and defense counsel each examined the parties involved. Following the examinations, the court determined that in each instance there were insufficient grounds to declare a mistrial.

¶ 26 We fail to see how two nonprejudicial incidents can combine to form the requisite prejudice to establish that Cardall should

have been granted a mistrial. Cumulative error occurs where a defendant's right to a fair trial is prejudiced by a number of errors. *See State v. Ellis,* 748 P.2d 188, 191 (Utah 1987); *State v. Rammel,* 721 P.2d 498, 501–02 (Utah 1986); *State v. McKenzie,* 186 Mont. 481, 608 P.2d 428, 448, *cert. denied,* 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980). In this case, the trial court found that no errors were committed, and we agree; therefore, the doctrine of cumulative error does not apply. *See id.*

## II. REVIEW OF PRIVILEGED DOCUMENTS

¶ 27 Lastly, Cardall contends that the trial court erred in failing to conduct an in camera review of S.F.'s school psychological records to determine if the records contained any information which would be helpful to him at trial. He specifically sought access to an "anxiety exam" which was administered to S.F. by a school counselor. Cardall relies on *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), where the United States Supreme Court held that a defendant convicted of various sexual offenses against a child was entitled to have the trial court review his alleged victim's otherwise privileged Children and Youth Services file reviewed by the trial court to determine whether it contained evidence material to the defense. *Id.* at 1002.

¶ 28 The State asserts that S.F.'s school psychological records, including the "anxiety exam," are privileged under Utah law. The State relies on rule 506 of the Utah Rules of Evidence which states in part that "a patient has a privilege, during the patient's life, to refuse to disclose and to prevent any other person from disclosing (1) diagnoses made, treatment provided, or advice given, by a physician or mental health therapist, (2) information obtained by examination of the patient." Utah R. Evid. 506(b); *see also* Utah Code Ann. § 58–60–113,[2] –114. In addition, the State argues that even under *Ritchie,* Cardall has no right to an in camera review because he has failed to establish some basis for concluding that S.F.'s school psychological records contain evidence material to his defense.

¶ 29 The State errs in both of its assertions. While it is true that a therapist-patient privilege exists in Utah, this privilege is not absolute. Under our rule, no privilege exists where "a communication relevant to an issue of the physical, mental, or emotional condition of the patient in any proceeding in which that condition is an element of any claim or defense." Utah R. Evid. 506(d)(1); *see also* Utah Code Ann. § 58–60–114(2)(b). This alone appears to give Cardall the right to review S.F.'s school psychological records because the focus of his defense was that S.F. is a habitual liar, that she fabricated her story about being raped, that she is mentally and emotionally unstable, and that the records show that on at least one previous occasion these psychological traits led her to lie about an attempted rape or sexual touching by the school janitor. However, we believe this exception to privilege is limited by *Ritchie.*

¶ 30 In *Ritchie,* the Supreme Court held that where an exception to privilege allows a defendant access to otherwise confidential records, the defendant does not have the right to examine all of the confidential information or to search through state files without supervision. 480 U.S. at 59, 107 S.Ct. 989 (citing *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). However, if a defendant can show with reasonable certainty that exculpatory evidence exists which would be favorable to his defense, *Ritchie* gives him the right to have the otherwise confidential records reviewed by the trial court to determine if they contain material evidence. *Id.* at 60, 107 S.Ct. 989. Evidence is deemed "material" where " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Id.* at 57, 107

---

2. This section reads, "Evidentiary privilege for mental health therapists regarding admissibility of any confidential communication in adminis- trative, civil, or criminal proceedings is in accordance with Rule 506 of the Utah Rules of Evidence."

S.Ct. 989 (quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375).

¶ 31 Currently, it is impossible to say whether the information in S.F.'s school psychological records would have been material to Cardall's defense because the trial court refused to review the records. *See id.* We recognize that the State has a substantial interest in protecting the type of information Cardall seeks, but we do not believe this interest prevents disclosure of privileged information in all circumstances. *Id.* In this instance, our rule provides an exception to the privilege because S.F.'s mental and emotional state is an important element of Cardall's defense. *See* Utah R. Evid. 506(d)(1).

■ ¶ 32 In light of *Ritchie,* we take our analysis one step further. In cases where a defendant makes only a general request for information from otherwise privileged records, "it is the State that decides which information must be disclosed." *Ritchie,* 480 U.S. at 59, 107 S.Ct. 989 (footnote omitted) (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)), and "[u]nless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." *Ritchie,* 480 U.S. at 59, 107 S.Ct. 989 (citing *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977)). A defendant has no constitutional right to conduct his own search of the State's files. *Id.* at 59, 107 S.Ct. 989. However, where "a defendant is aware of specific information contained in the file . . . , he is free to request it directly from the court, and argue in favor of its materiality."

*Id.* at 60, 107 S.Ct. 989.

¶ 33 Here Cardall specifically requested that the trial court review S.F.'s school psychological records, including the "anxiety exam," and he generally requested any information regarding S.F.'s allegations regarding an attempted rape by a school janitor. Cardall asserts that this evidence was and is material to his defense because the outcome of the trial depended entirely on S.F.'s credi-bility. Although we reject Cardall's claim that the case turned *entirely* on S.F.'s credibility, it is true that S.F.'s testimony was a critical element for both the prosecution and the defense.

¶ 34 If S.F.'s school psychological records indicate that S.F. has a high propensity to lie—as Cardall asserts—and if the records show that S.F. previously lied about an attempted rape by a school janitor, this is evidence which might have been material to Cardall's defense had it been disclosed. Cardall has made an adequate showing that the "anxiety exam" exists. We therefore hold that "he is free to request it directly from the [trial] court, and argue in favor of its materiality." *Ritchie,* 480 U.S. at 60, 107 S.Ct. 989. In regard to the rest of S.F.'s school psychological records, we hold that Cardall is entitled to an in camera review by the trial court to determine whether the records contain information which might be material to his defense.

¶ 35 We therefore remand this case to the trial court with instructions to proceed in a manner consistent with this opinion. If the trial court is persuaded that the "anxiety exam" or any other information in S.F.'s school psychological records constitute material evidence which, had it been disclosed, probably would have changed the outcome of Cardall's trial, then he must be given a new trial. *See Ritchie,* 480 U.S. at 58, 107 S.Ct. 989. If the records do not contain material evidence, "or if the nondisclosure was harmless beyond a reasonable doubt," *id.,* the judgment and conviction will stand.

¶ 36 Associate Chief Justice DURHAM, Justice STEWART, Justice ZIMMERMAN, and Justice RUSSON concur in Chief Justice HOWE'S opinion.